## BAGLEY v. UNITED STATES.
### No. 10554.

Circuit Court of Appeals, Fifth Circuit.

June 11, 1943.

A. C. Wheeler, of Gainesville, Ga., for appellant.

M. Neil Andrews, U. S. Atty., and Raymond W. Martin and J. Ellis Mundy, Asst. U. S. Attys., all of Atlanta, Ga., for appellee.

Before HUTCHESON and WALLER, Circuit Judges and COX, District Judge.

HUTCHESON, Circuit Judge.

██ Convicted of the offense of having knowingly hindered and interfered by force and violence with the administration of the Selective Training and Service Act of 1940,[1] and given a penitentiary sentence, defendant appealed. Here he insists that the indictment did not charge,[2] the proof [3]

---

[1] "* * * Any person or persons who shall knowingly hinder or interfere in any way by force or violence with the administration of this Act or the rules or regulations made pursuant thereto". 50 U.S.C.A. Appendix § 311.

[2] It charged:

"That Nubie Glenn Bagley, hereinafter called defendant * * * being a person subject to all the provisions of the Selective Training and Service Act of 1940, as amended, and the rules and regulations made pursuant thereto, did on or about June 6, 1942, knowingly, unlawfully and feloniously hinder and interfere by force and violence with the administration of this Act and the rules and regulations made pursuant thereto, and did then and there unlawfully, knowingly and willfully make to and in the presence of R. C. Martin, W. Ed. Eubanks and J. E. Hansard, in said Division and District aforesaid, and within the jurisdiction of said Court, a threat to inflict bodily harm upon the members of Local Board No. One, Forsyth County, State of Georgia, and did then and there say to and in the presence of the said R. C. Martin, W. Ed. Eubanks and J. E. Hansard in substance and to the effect as follows, to-wit:

"That he, the said Nubie Glenn Bagley, was not going into the United States Army; that the Selective Service Board could not make him go; that he would stretch the members of the Local Board No. One, Forsyth County, State of Georgia, out in his truck and haul them off, which said threat was communicated to Local Board No. One, Forsyth County, State of Georgia, and the Members of said Local Board, and which said threat and threats so communicated so created fear and intimidation in the minds of the Members of said Board as to hinder and interfere with the administration of the official affairs and duties of said Local Board No. One, Forsyth County, State of Georgia, and the members thereof, in the administration of the Selective Training and Service Act of 1940, as amended, and the rules and regulations made pursuant thereto".

[3] This was the evidence on the issue of force and violence:

Bagley, a farmer with only three years of schooling, was addicted to drinking. About June 5th or 6th, 1942, being pretty well under the influence of liquor, he came into the store of Clark Martin, a brother of Carl Martin, one of the members of the draft board, at Brandywine, Georgia, and as J. D. Hansard, the chief witness for the Government testified, the following occurred:

"He (Bagley) was sitting on a counter in the store. I heard him talking to the crowd making remarks to the crowd as a whole—he got to talking about a questionnaire he said he burned his up—he was 100% per cent for Hitler and would help him any way he could—he wasn't going to the army—they were crazy as hell if they thought he was going to the army. He would haul them off in the back of his pickup—he had mentioned nobody else's name before I heard him make that conversation, only Hitler—when we was all sitting around there he came in the store—somebody had a questionnaire—one of those occupational I think it was—he just come in, set down and got to talking about the questionnaires, some of them did, I don't remember who—he said he burned his up—he would help old Hitler every way he could —they was crazy as hell if they thought they was going to take him to the army—

did not make out, the offense, and the judgment must be reversed. We agree. The language in which the act was couched was not put there by accident or inadvertence. It was carefully chosen by Congress when this country was not at war but only preparing for its eventuality in order to insure, the fullest preservation of freedom of opinion and expression, that the act would not be the instrument of partisan prosecution to suppress that freedom, and that prosecutions under it would be brought only where there was forcible rather than ideological opposition to the draft. The

he would haul them off in the back of his truck if they thought they was going to trick him off—haul off the board. After I heard him talk I talked to Mr. Martin a member of the Board about it, but I don't remember a word I told him—that was Mr. Carl Martin, a board member—I communicated what I heard Bagley say in the store there to him—I don't remember how long it was after I heard Bagley say it."

On cross-examination, he testified Bagley appeared to be drinking. "I couldn't say whether he was very drunk, I don't know. He never did use any board member's name. He did use the word Board —he said that Board was as crazy as hell if they thought they was going to get him in the army. He didn't say what Board— just said Board—didn't say anything about any particular board or name anybody. There were no members of Forsyth County Draft Board present. * * * He didn't have any gun or anything of the kind—he did not use any force toward anybody that was there. He did not show any weapon of any kind. He made no threats to hit any individual or to shoot any individual or do anything to any individual. So far as I saw he had no weapon or anything he could have hurt anybody with. * * * Bagley talked in a pretty mild language. * * * He did not appear to be mad, just kind of talking you know, just like carrying on a conversation. I did not hear anybody chide him—I don't think any of them said anything back to him. * * *"

J. E. Hansard testified about to the same effect and said: "I believe he said he was 100% for Hitler because Hitler was right and if he had to go to the Army he would do everything he could for him—would be glad to enlist any time to get to fight against England. * * * After Bagley left, I went by Carl Martin's and told him what Bagley said. We were standing talking and Bagley drove up and stopped. Of course, he did not say anything against the Board to Carl Martin, but he came over with an oath, I believe he did and told him that he burned his occupational questionnaire. * * * He come off like he did down at the store about he was for Hitler—if he had to go to the army he would fight against it. He didn't tell him they couldn't send him, nothing like he did down at the store. He left out the threats."

On cross-examination, he testified: "He (Bagley) didn't say he was going to haul them off or would haul them—just said he had room to.—I did not see any weapon about him of any kind—he wasn't violent, he was just talking, was just in a big way of talking. * * * I never heard anything against any of his family. It is as nice a family as ever lived in this country, but Glenn got started out drinking. I never heard nothing out of him except when he was drinking."

Webb testified that he was at the store and heard Bagley say that if they sent him to the army or fixed to, * * * why he could put them in his pick-up and haul them off.

Eubanks testified that he was at the store and heard Bagley say that "if the board was smart if they sent him to the army and if they didn't send him they didn't have any sense at all and he would straighten them out in the back end of his pick-up and haul them away. He didn't make any statement about his questionnaire. He was drinking, I think. * * * He acted like people that was drinking. I could tell by the way he talked and the way he done."

The Board members testified that Carl Martin told them about the conversation at the store and that they decided to have the authorities look into it. Carl Martin, a board member to whom the story was carried and who told the board, testified "After these threats were communicated to me, Mr. Bagley come to see me and stopped there a little while. He didn't stay there very long. He said something to me in regard to the cotton, I don't remember just what—I had been connected with Triple A but was not at that time. When he got through talking about the Triple A, he said he was 100% for Hitler and he would be glad to volunteer in the German army to whip England. * * * He came to see me and talked to me again two or three days after that. He just repeated about the conversation he had previously had about being 100% for Hitler and volunteering in the German Army to whip England. He also said: 'I am sorry I acted the way I did down at the store the other

words chosen are not new words in American law.[4] They are particularly not new in federal statutes.[5] They were chosen in the light of the meaning which long and consistent use in American law had given them, and war hysteria may not impart to or distill from them any different meaning. If Congress had desired to denounce as the offense "threats to use" rather than "the use of" force and violence, it could easily have followed the pattern laid down in 18 U.S.C.A. §§ 89, 338a and 408d. The feeings of distaste and resentment aroused by the defendant's drunken boastings may not take the place of charge and proof that he has violated a criminal statute. "At a time when passion and prejudice are heightened by emotions stirred by our participation in a great war", Viereck v. United States, 63 S.Ct. 561, 566, 87 L.Ed. ——, we must be particularly careful to hold to the foundations of our freedom. One of these is that "one may be subjected to punishment for crime in the federal courts only for the commission or omission of an act defined by statute, or by regulation having legislative authority, and then only if punishment is authorized by Congress". Idem. It must be conceded that defendant's conduct in destroying his first questionnaire and his drunken boasting though not carried out in fact that he would destroy the next one if they sent it to him, his approval of Hitler and his expressed preference to fight with Hitler against England rather than with England against Hitler were most reprehensible, but if these acts and statements constituted offenses against federal laws, he was not prosecuted for them.

He was prosecuted for and only for having by force and violence interfered with and hindered the draft board in the discharge of its duties, and the force and violence charged were the mere utterance of words under circumstances which could not amount to acts of force and violence, hindering and interfering with the draft board in the performance of its duties. For they were not said to any member of the draft board or anyone acting for it while in the attempted discharge of its duties, and it was neither charged nor proved that the remarks were made for the purpose or with the intention of having them communicated to the board so that they might influence its actions. As one witness put it, it was "big talk", and as the evidence makes it clear, it was the big talk of a person unduly in his cups. We are not prepared to hold, and we are not holding that threats of violence made to members of the draft board or to persons acting for them, with the intent and purpose of interfering with them in the discharge of their duties, or made to strangers with the intent and purpose that they be communicated to the board, if the threats are made under circumstances showing that the threatener has the will, the purpose and the means to carry out his threats, could not be held to amount to the use of force and violence within the statutes. But the indictment does not charge, the proof does not make out such a case. No member of the board was present at the cracker barrel session at the local store, and it is not charged that defendant's inebriate utterances were made with the intent that they be communicated to the

---

day. I am sorry I talked the way I did down at the store'. He did not tell me what he said down at the store * * * Those threats communicated to me did hinder and interfere with my official duties as a member of that Board. * * * Mr. Bagley was always perfectly courteous to me. He made no threats in my presence. * * * He didn't threaten any member of the board· in my presence." The defendant himself testified that he remembered being at the store, that he was pretty drunk, so drunk that he didn't know what he was doing and did not remember. That he had never knowingly made any threats against any member of the local board, and had never had any intention in any way to do any violence or injury to any member of the board, that he had never expressed any such intention while he was in his right mind. He attended school three years. "I never did go pow-

erfully much for schools, maybe two or three months a year."

4 Words and Phrases, Vol. 17, Perm. Ed., p. 237: In no instance of their use in the statutes have mere words unaccompanied by acts or conduct showing intent and ability to exercise and apply physical power been held to constitute force and violence. Cf. McGeorge v. Commonwealth, 237 Ky. 358, 35 S.W.2d 530, 531.

5 Cf. Lewin v. United States, 1 Cir., 62 F.2d 619; An indictment for forcibly interfering with members of the coast guard; Colyer v. Skeffington, D.C., 265 F. 17, Strecker v. Kesler, 5 Cir., 95 F. 2d 976 and Kesler v. Strecker, 307 U.S. 22, 59 S.Ct. 102, 83 L.Ed. 371, dealing with deportation, under the Act of Oct. 16, 1918, as amended by the Act of June 5, 1920, 8 U.S.C.A. § 137, of aliens who seek the overthrow of the government by force and violence.

board and with the purpose to carry them out. The utterances the indictment charges were in themselves so fantastic as to be silly and were made under such circumstances as that they cannot in law and fact be said to be that use of force and violence to prevent administration which the statute denounces. When it comes to proof, there is even less basis for the conviction. The board member whose brother-in-law heard the defendant's big talk at the store and reported it to the member who in turn reported it to the board, testified that the defendant came to his house shortly after he had been at the store; that he did tell him that he had burned the questionnaire and that he was for Hitler; but that he didn't threaten him or talk offensively to him. He testified too that within the next day or so, the defendant came again to see him, and without telling him what he had said volunteered an apology, saying, "I am sorry I acted the way I did down at the store the other day. I am sorry I talked the way I did down at the store." In the light of this voluntary apology, showing that Bagley did not intend what he said at the store to have any effect on the Board, it may not be said that the words spoken at the store constituted the interference by force and violence at which the act is aimed. If it is said that the board member did not communicate this apology to the board but withheld knowledge of it from them, this will not help the government's case. It will merely show that the board member, on whose word the board had been thrown into the state of fear and inactivity they testified to did not truly represent to the board the defendant's attitude. It will merely show that the state of mind they were in was induced not by a true statement of defendant's attitude toward the board but by a suppression of that truth. In Moore v. United States, 5 Cir., 128 F.2d 974, 976, a prosecution under this section, it was shown that the defendant struck one member of the board and asserted that he intended to administer similar bodily punishment to another member. This court in affirming the conviction said: "The day before the assault was committed, Moore had announced that he would prevent a member of the board from putting him in the army, and that he would straighten out the board in regard to his classification. His *later acts* made clear that it was his intention to produce this result by the illegal method of force and violence rather than the legal procedure of producing additional evidence." (Emphasis supplied.) Here not only were there no later acts consistent with the remarks made at the store, there was an apology to a member of the board for the making of those remarks. Because the indictment did not charge, and the proof did not make out, an offense, the judgment is reversed, and the cause is remanded for further and not inconsistent proceedings.