**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**John Wayne BARANSKI et al.,
Defendants-Appellants.**

**No. 72-1345.**

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 15, 1973.

Decided Aug. 29, 1973.

558

Anthony A. D'Amato, Gerald M. Werksman, Edward B. Arnolds, intern-

at-law, Chicago, Ill., for defendants-appellants.

James R. Thompson, U. S. Atty., William T. Huyck and Gordon B. Nash, Jr., Asst. U. S. Attys., Chicago, Ill., for plaintiff-appellee.

Before DUFFY, Senior Circuit Judge, and KILEY and PELL, Circuit Judges.

PELL, Circuit Judge.

On the afternoon of April 29, 1971, accompanied by a reporter whom they had invited to witness a newsworthy event, the four defendants-appellants went to a building in Evanston, Illinois, housing the offices of three draft boards, opened drawers and filing cabinets there, pulled some records, and poured animal blood over them. They waited quietly for the police, whom a board secretary had telephoned, to arrive. When the police came, the defendants stated that they would submit to arrest nonviolently. They then asked if they might pray, received permission, and proceeded to pray and to read aloud from the New Testament. They also distributed a signed letter in which they attempted to justify their actions.

Subsequently, the defendants were charged in a four-count indictment with (1) willful damage to governmental property, 18 U.S.C. § 1361; (2) removal, mutilation, and destruction of records, 18 U.S.C. § 2071; (3) interfering with the administration of the Military Selective Service Act, 50 U.S.C. App. § 462(a); [1] and (4) conspiracy to commit the above offenses, 18 U.S.C. § 371. A jury acquitted the defendants on the three substantive counts but convicted them of violating Section 371, the conspiracy count. Each defendant was sentenced to one year in prison.

---

1. In part, Count III charged that the four defendants "did willfully and knowingly hinder, interfere *and attempt to do so*, by force, violence *and otherwise*, with the administration [of the Selective Service Act and regulations thereof] by entering the offices · . . . and removing, tearing, and pouring a red liquid substance over Selective Service files and thereby destroying official records contained therein and by disrupting official activities at said location; in violation of Title 50 Appendix, United States Code, Section 462(a)." (Emphases added.)

Of significance to the disposition reached, the "removing," "tearing," "pouring," and "destroying" would appear to be the only activity of the defendants which could reasonably be equated with "force" or "violence."

At trial, the defendants, three of whom had elected to proceed *pro se*, argued that they had not acted with an unlawful purpose. Their aim allegedly had been to save lives. They stressed what they considered to have been the educational and symbolic nature of their acts. On appeal, they raise several issues, the resolution of any one of which in their favor would assertedly mandate reversal of the judgments of conviction. Most of these issues concern supposed trial errors.[2] The defendants' primary contention, however, is that the pertinent portion of 50 U.S.C. App. § 462(a), the violation of which was one of the alleged objectives of the conspiracy, is unconstitutional.[3]

In considering the contentions of the defendants, we do so on the basis that they are to be accorded the same constitutional protection and fair trial rights possessed by every other individual in our system of justice. Irrespective of the sincerity with which they held their beliefs, and despite their motivation, which reasonably could be construed as having prompted a protest made on behalf of their fellows of the human race against the then current war involvement, the defendants' invasion of a governmental office and the destruction of its records are intolerable and inexcusable in a civilized society. While we deny condonation, we do not deny basic rights which must be protected in an evenhanded manner if a civilized society is to be maintained.

# I

## Standing Issue

We must first determine whether the defendants may challenge their conspiracy conviction on constitutional grounds. The Government argued below and argues here that the defendants may not seek the reversal of the judgments against them because they question the constitutionality of only one of the three unlawful "objects" of the conspiracy, namely, the violation of 50 U.S. C. App. § 462(a). The Government contends that the jury could have reasonably determined that the defendants (a) had conspired to violate either or both of the other two statutes, the constitutionality of which the defendants do not contest, and (b) had not conspired to violate Section 462(a).

Our attention has been directed to no case that is "on all fours" with the present case, and the Government cites only one decision, United States v. Tanner, 471 F.2d 128 (7th Cir. 1972), cert. denied, 409 U.S. 949, 93 S.Ct. 269, 34 L. Ed.2d 220, to support its argument. *Tanner* in relevant part states:

"In addition, *Rice* and *Chipman* challenge Count IV of the indictment [a substantive count] for failing to allege acts that fall within the 'special maritime and territorial jurisdiction of the United States.' We fail to see how *Rice* and *Chipman* have standing to raise this claim since neither were indicted for the substantive offense charged. The offense charged in

---

2. These other issues are: (1) whether the trial judge erred by failing to examine prospective jurors regarding their possible religious prejudices and prejudices against anti-war activists; (2) whether the judge violated Rule 43, Fed.R.Crim.P., by communicating with the jury off the record and outside the presence of the defendants in respect to questions submitted by the jury during its deliberations; (3) whether the judge erred by responding as he did to the jury's questions; and (4) whether the supplemental, allegedly "*Allen*-type" charge given by the judge on his own motion was proper.

3. Count IV, the conspiracy count, charged, in part, a conspiracy

"to willfully hinder and interfere with the administration of the Military Selective Service Act of 1967, in violation of Title 50 Appendix, United States Code, Section 462(a)."

The count also charged a conspiracy to violate two other statutes, 18 U.S.C. §§ 1361 and 2071, the subjects of substantive counts I and II, respectively.

The full text of Count IV is set forth in the appendix of this opinion.

Count IV affected the trial of these appellants only insofar as it was one of the several unlawful objects alleged in the conspiracy count. However valid appellants' claim is on this issue, it does not affect their convictions on the conspiracy count so long as any one of the objects of the conspiracy is unchallenged." 471 F.2d at 139–140.

■ We are not persuaded that, on the basis of this brief paragraph, we must abort defendants' constitutional claims. In *Tanner*, Count IV charged a substantive violation of 18 U.S.C. § 1363, and the conspiracy count charged a conspiracy to commit actions in violation of 18 U.S.C. §§ 837, 1363, 1364, 1952, 2275, 81, and 1992. See United States v. Tanner, 279 F.Supp. 457, 463 n.1 (N.D.Ill.1967). The challenge to Count IV in *Tanner* did not go to the constitutionality of § 1363 nor was the section per se otherwise challenged. The contention which this court ultimately accepted in reversing as to Count IV was that factually there had been no violation of the statute inasmuch as the damaged dock and vessel were not at the time upon a body of water which would accord federal jurisdiction, although such jurisdiction had been alleged in the count. The particular holding in *Tanner* involves, therefore, nothing more than the well-established law that conspirators need not accomplish the violation of the laws with which they are charged with conspiring to violate. 15A C.J.S. Conspiracy § 44, at 753 (1967). This is a far cry from saying that a person can properly be charged with conspiring to commit a violation of an unconstitutional statute, the foundation stone of the crime.

Also, unlike Rice and Chipman in *Tanner*, the defendants here were named in all the substantive counts referred to in Count IV, the conspiracy charge. Because the jury returned a general verdict on that count, we cannot know which of the three statutes the violations of which were the "objects" of the conspiracy the jury relied on in convicting the defendants. The trial court had instructed the jury that actions taken to attain *any* of the three alleged objects would suffice for conviction. We do not assume that the learned trial judge had any intention to footnote this instruction by a proviso: "even though one of the objects was the violation of a statute unenforceable because of unconstitutionality."

Although the defendants do not challenge the constitutionality of Sections 1361 and 2071, their failure in this respect does not amount to a concession that they were guilty of conspiring to violate the statutes which the jury found they had not violated substantively. It is hornbook law that a conspiracy to commit a crime is a different offense from the commission of the crime which is the object of the conspiracy. However, the defendants point out in connection with the triple object of the conspiracy count that the "jury may have reasonably concluded on the basis of the evidence at trial that the defendants neither conspired to damage or attempt to damage government records in excess of $100, nor conspired to remove, mutilate, obliterate or destroy government records, nor conspired to use means of force or violence to hinder the administration of the Selective Service system." The simple fact is that we cannot say with any certainty which of the three objects was crucial to the jury's determination.

We are not unmindful of general statements in the cases to the effect that proof of conspiracy to violate any one of several statutes alleged in the indictment will support a conviction. See, *e. g.*, United States v. Mack, 112 F.2d 290 (2d Cir. 1940). While we do experience some conceptual difficulties with this general statement, recognizing again that the offense of conspiracy is separate from the statutory offenses constituting the objects of the conspiracy and assuming arguendo the correctness of the general statement, we do not find the principle applicable in the particular factual situation here involved because of our inability to state the basis of the

jury's determination. We decline to speculate on such a matter.

To the extent that an isolated statement that there is "no failure of proof in the fact that one of its objects alleged as unlawful may not have been so," Moss v. United States, 132 F.2d 875, 878 (6th Cir. 1943), appears to be inconsistent with the result we have reached, we cannot accept the implication as being applicable here, and, if it is, we cannot accept it as good law.

The controlling matter here, in our opinion, is not the proof upon which the jury might have convicted under the conspiracy count but rather the proof upon which the jury did convict. Chief Justice Hughes put the matter well in an analogous situation in Stromberg v. California, 283 U.S. 359, 367–368, 51 S. Ct. 532, 535, 75 L.Ed. 1117 (1931):

> "The verdict against the appellant was a general one. It did not specify the ground upon which it rested. As there were three purposes set forth in the statute, and the jury were instructed that their verdict might be given with respect to any one of them, independently considered, it is impossible to say under which clause of the statute the conviction was obtained. If any one of these clauses, which the state court has held to be separable, was invalid, it cannot be determined upon this record that the appellant was not convicted under that clause. It may be added that this is far from being a merely academic proposition, as it appears, upon an examination of the original record filed with this Court, that the State's attorney upon the trial emphatically urged upon the jury that they could convict the appellant under the first clause alone, without regard to the other clauses. It follows that instead of its being permissible to hold, with the state court, that the verdict could be sustained if any one of the clauses of the statute were found to be valid, the necessary conclusion from the manner in which the case was sent to the jury is that, if any of the clauses in question is

invalid under the Federal Constitution, the conviction cannot be upheld."

A further parallel is noted in that in final argument in the present case the Government's attorney stated:

> "Now the defendants have tried to make a point that they were peaceful, that they didn't use force or violence. Well, that is not required. The statute says 'otherwise.' Anyway in which they interfere, such as damaging."

The Government in its brief reads this as meaning "hindering acts that an ordinary person might not think of as forceful or violent." Juries are not necessarily composed of "ordinary" persons, but even an ordinary person might well, in recalling the final argument, fasten on the words, "[t]he statute says 'otherwise,'" and not remember the qualifying example which did not purport to be exclusive nor limited to matters like "force or violence." As will be developed hereinafter, the words "or otherwise" are of substantial significance to the result we reach. Even if the Government attorney did not purport in closing argument to include communication by letter or speech in "or otherwise," there likewise was nothing which would exclude interfering or hindering by communication.

In sum, we are of the opinion that the statutory requirement of conspiring to commit an "offense against the United States," 18 U.S.C. § 371, is not fulfilled by an offense which fails to meet constitutional muster even though that offense is only one of several alleged.

At this point, we note a significant distinction between Counts III and IV. Although Count III supposedly was based on a violation of 50 U.S.C. App. § 462(a), it did not follow the statutory language in what we deem to be an essential respect. The statute refers to "force or violence *or* otherwise"; Count III, the substantive count, uses "force, violence *and* otherwise." (Emphases added.)

To convict under the substantive count, the jury arguably would have had to find that the defendants used force and violence; in contrast, to convict under Count IV, the jury would not have had to find that the defendants had intended to use force and violence. It is the "or otherwise" phrase that defendants contend invalidates the statutory provision.

## II

### Constitutional Challenges

Section 462(a) contains many clauses, but the one with which we are here concerned reads as follows:

> "or any person or persons who shall *knowingly hinder or interfere or attempt to do so in any way, by force or violence or otherwise, with the administration of this title* or the rules or regulations made pursuant thereto, or who conspires to commit any one or more of such offenses, shall, upon conviction in any district court of the United States of competent jurisdiction, be punished by imprisonment for not more than five years . . . ." (Emphasis added.)

The words "or otherwise" were not in the original act but were added by way of amendment in 1948.

The defendants attack this clause of § 462(a) as presently constituted on three grounds: (1) it lacks the specificity required of a criminal statute, and, hence, its application to the defendants deprived them of due process of law in violation of the Fifth Amendment; (2) it is unconstitutional on its face because it abridges the freedom of speech guaranteed by the First Amendment; and (3) it is unconstitutional as applied to these defendants because it infringes their right to freedom of speech.

## III

### Void-for-Vagueness Issue

The defendants begin their void-for-vagueness argument by quoting the Supreme Court's formulation of the vague-ness doctrine: "[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law." Connally v. General Constr. Co., 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926). Next, to apply this general rule to their case, the defendants adopt the analysis that they assert the Supreme Court recommended in Baggett v. Bullitt, 377 U.S. 360, 368–370, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964), namely, the positing of hypothetical questions in order to determine whether the contours of a statute are reasonably ascertainable. After presenting these questions, the defendants conclude that "[t]he result is that no one can be sure of what among a vast range of possible acts would be criminally prohibited under this statute . . . . One could hardly ask for a more subjective statutory term in a criminal statute than the term 'or otherwise.'"

However, in relation to the vagueness issue, the emphasis, in our opinion, must be on "hinder" and "interfere" rather than, on "or otherwise," *i. e.,* the impact rather than the means of accomplishment.

■ We first note that the difficulty of determining whether certain marginal cases are within the meaning of the language of a challenged criminal statute does not automatically render that statute unconstitutional for indefiniteness. United States v. Petrillo, 332 U.S. 1, 7–8, 67 S.Ct. 1538, 1542, 91 L.Ed. 1877 (1947). "[T]he Constitution does not require impossible standards." *Id.*

Second, a number of courts have found "hinder" or "interfere" or words synonymous with them to be sufficiently precise, see, *e. g.,* Cameron v. Johnson, 390 U.S. 611, 615–616, 88 S.Ct. 1335, 20 L.Ed.2d 182 (1968); People v. Del Toro, 155 Colo. 487, 395 P.2d 357, 358 (1964); Powers v. McCullough, 258 Iowa 738, 140 N.W.2d 378, 384–385 (1966). Similar language is used in other federal

criminal statutes, *e. g.*, 18 U.S.C. §§ 1501–1510, and these statutes have survived constitutional attack. See, *e. g.*, Anderson v. United States, 215 F.2d 84 (6th Cir. 1954), cert. denied, 348 U.S. 888, 75 S.Ct. 208, 99 L.Ed. 698.

■ Further, the words "hinder or interfere" must be considered in context, *see* Grayned v. City of Rockford, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). Whether certain acts hindered or interfered with the administration of the Selective Service Act is a factual question for a jury to determine. The task does not present insuperable difficulties for a jury. In a prosecution under the pertinent part of Section 462(a), the Government has to prove to the jury's satisfaction that a defendant's acts had the necessary prohibited impact.[4] *Cf.* Hartzel v. United States, 322 U.S. 680, 64 S.Ct. 1233, 88 L.Ed. 1534 (1944). In this connection, we point out that the Government also must prove specific intent. That is, not only does the prosecutor have to establish the deleterious effect of a defendant's actions (or the attempt to achieve that effect), but he must also establish that the defendant *knowingly* acted with the purpose of doing that which the statute prohibits. The provision thus exempts innocent or inadvertent conduct. *See* Screws v. United States, 325 U.S. 91, 101, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945); Hartzel v. United States, *supra*.

■ In light of these authorities, we conclude that the words "hinder or interfere" are sufficiently precise.

Consideration of the additional language "by force or violence or otherwise" does not alter our conclusion. That language indicates the means which one may not use to accomplish the unlawful hindrance or interference. Although the phrase does not specify all the prohibited means, it does adequately inform one that any method by which

the purposeful interference is accomplished or attempted to be achieved is improper. Thus, it serves a clarifying function and is not, as the Government surprisingly asserts, "undoubtedly superfluous."

Based on the foregoing discussion, we find that the part of Section 462(a) in question here is not so vague as to violate constitutional requirements.

## IV

### *The First Amendment Overbreadth Issue*

"In every instance a statute must on its face be at least adequately complete and precise to give notice to reasonable men as to what conduct is prohibited. . . . But a statute's warning may extend too far—it may describe and give warning regarding conduct which cannot be constitutionally penalized." United States v. Dellinger, 472 F.2d 340, 355 (7th Cir. 1972), cert. denied, 410 U.S. 970, 93 S.Ct. 1443, 35 L.Ed.2d 706, (1973) (footnotes omitted). The defendants argue that the relevant clause of Section 462(a) suffers from this defect.

■ Judge Fairchild's explication in *Dellinger, supra*, of the overbreadth doctrine is germane here. Not only does it pithily summarize a complicated topic, but it is an important and recent precedent in this circuit. Under Judge Fairchild's analytic approach, a court should answer two main questions: (1) "the *threshold* question whether the statute relates to expression and is therefore governed by first amendment considerations," and (2) "the *removal question,* whether the expressive conduct is so related to action that the expression is therefore carved away from the protection of the first amendment." 472 F.2d at 358. (Emphases in original.)

■ As to the first question, we look not merely to the words of the statute

---

4. The fact that "attempt" is expressly included in § 462(a) would not change the requisite proof as an attempted act would

necessarily have to have the prohibited impact of hindrance or interference upon accomplishment.

but to its impact also. Thus, that the challenged clause of Section 462(a) does not explicitly refer to speech or expression does not foreclose the conclusion that it is unconstitutionally overbroad. "[I]f a statute in its impact has or can be expected substantially to involve expression, that must be sufficient, whether or not the words of the statute so provide." United States v. Dellinger, 472 F.2d at 358.

The Government admits that the "hinder or interfere" clause when linked to "otherwise" accomplishment is susceptible to unconstitutional application. It asserts, however, that the provision affects First Amendment rights in only "remote circumstances" because its aim allegedly is the regulation of noncommunicative conduct only. As further support for the claim that the clause poses no substantial threat to First Amendment interests, the Government argues that no prosecutor has yet misused the statute and that if an overzealous U.S. Attorney were to prosecute someone for privileged conduct, the courts would point out his error.

The Government's response does not still the defendants' qualms—nor does it allay our doubts as to the constitutionality question. The existence of the weapon is the chilling factor in inhibiting free expression and the speculative possibility that the weapon might not be used provides scant warmth to one whose proposed expression might conceivably be within wounding range.[5] In our discussion of the void-for-vagueness issue, we indicated that the challenged provision provides adequate warning because it informs one that all acts the intended effect of which is the hindering of or interfering with the administration of the Selective Service Act are forbidden. The statute, literally read, proscribes the use of *any means whatsoever* to accomplish the hindrance. In United

States v. Eberhardt, 417 F.2d 1009 (4th Cir. 1969), cert. denied, 397 U.S. 909, 90 S.Ct. 907, 25 L.Ed.2d 90 (1970), an appeal by Father Philip Berrigan and others from convictions stemming from their having poured blood on Selective Service files in a Baltimore, Maryland, draft board office, the Fourth Circuit stated:

"Also incorrect is the appellants' position that the statute requires a showing of 'force or violence.' The statute clearly states that the hindering or interfering may be accomplished by 'force or violence or otherwise.' The words 'or otherwise' were added by section 12 of the Selective Service Act of 1948 evincing a plain intention to relieve the prosecution from the obligation to prove the use of aggressive force or violence." 417 F.2d at 1013 (footnote omitted).[6]

In their brief, the defendants present a number of hypothetical situations which the pertinent portion of Section 462(a) would encompass through the "or otherwise" phrase. The gist of these examples is that any person who objects to a particular policy of the Government which implicates the Selective Service system and who wishes his protest to be effective, that is, that the military's recruitment or draft activities be "hindered," risks being indicted for a felony —even if the protestor confines his efforts to nonforceful means such as speechmaking, pamphleteering, picketing, or peaceful assembly.

Because the statutory language is broad and unfocused, we cannot determine precisely what conduct—non-First Amendment activities, activities which at least have colorable claims to First Amendment protection, or both—it is meant to affect. It is no answer to argue that many broadly-worded laws lend themselves to impermissible applications. We cannot agree that the prob-

---

5. *Cf.* Baggett v. Bullitt, 377 U.S. 360, 373, 84 S.Ct. 1316, 1323, 12 L.Ed.2d 377 (1964), "Well-intentioned prosecutors . . . do not neutralize the vice of a vague law."

6. As previously noted, the jury may well have received the impression that the Government considered the word "otherwise" to be broad sweeping.

ability of invalid applications of the provision challenged here is simply conjectural or that its impact on protected conduct is slight.

In sum, the "or otherwise" phrase, by facially outlawing the use of any and all means to accomplish the forbidden hindrance or interference, inescapably comprehends First Amendment interests or, in Judge Fairchild's words, "relates to expression."

Under the *Dellinger* analysis, the second pertinent question we must consider is whether the "hinder or interfere" clause punishes expressive conduct only when it "is so related to [imminent lawless] action that the expression is therefore carved away from the protection of the first amendment." Certainly we can conceive of expressive conduct that comes within Section 462(a) and which would not be protected by the First Amendment. For example, as the defendants admit, the purposeful destruction of Selective Service records, even though intended by the actors to be "symbolic" and to express their opposition to the Selective Service system, would not per se be privileged under the First Amendment. *See, e. g.,* United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968).

However, the difficulty with the challenged provision is that its ban is not limited to expressive conduct "outside" the First Amendment. For example, a speaker or writer might declare in strong and persuasive terms that the war in Southeast Asia was intolerable and unconscionable and that every citizen should vocally protest the nation's participation. Irrespective of the correctness of such a view, its delivery in speech or writing might be accomplished with such a convincing sincerity that young auditors or readers would flee to Canada rather than answering the call of their Selective Service boards. Even though the words had this impact, it would be difficult to conclude that the speechmaking or pamphleteering was other than protected activity. Yet, the actor could be prosecuted for a violation of Section 462(a) in that he had attempted to hinder or interfere with the administration of the Selective Service by means "otherwise" than force or violence.

If the First Amendment has any substance, it must mean that the Government's powers, even where the Government is seeking to protect legitimate interests, are not absolute.[7] "The protection given speech and press was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people," Roth v. United States, 354 U.S. 476, 484, 77 S.Ct. 1304, 1308, 1 L.Ed.2d 1498 (1957). Further, the First Amendment protects us from the "censorship of ideas [which are] good or bad, sound or unsound . . . ." Miller v. California, 413 U.S. 15, 36, 93 S.Ct. 2607, 2621, 37 L.Ed.2d 419 (1973). "The right to speak freely and to promote diversity of ideas and programs is . . . one of the chief distinctions that sets us apart from totalitarian regimes . . . . It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger." Terminiello v. Chicago, 337 U.S. 1, 4, 69 S. Ct. 894, 895, 93 L.Ed. 1131 (1949). *Cf.* Emerson, The Right to Protest, in The Rights Of Americans 208, 224 (N. Dorsen ed. 1970, 1971), "No society, at least

---

7. *See* Scanlon, A Theory of Freedom of Expression, 1 Phil. & Public Affairs 204 (1972):

"The doctrine of freedom of expression is generally thought to single out a class of 'protected acts' which it holds to be immune from restrictions to which other acts are subject. . . . [O]n any strong version of the doctrine there will be cases where protected acts are held immune from restriction despite the fact that they have as consequences harms which would normally be sufficient to justify the imposition of legal sanctions. It is the existence of such cases which makes freedom of expression a signifcant doctrine . . . ."

no open society, can expect to achieve a state of perfect order." The challenged clause is so broadly worded that it interferes with protected conduct.

■ Although the Government declares that "clearly there is a valid commonsense construction of the statute which avoids abridgment of first amendment interests," the construction it proposes is the elimination from consideration of the phrase "by force or violence or otherwise." We have two objections to this proposal. First, we are hesitant to wield the judicial scalpel on a congressional enactment in such a procrustean fashion, particularly where the most constitutionally troublesome language resulted from an amendment to the basic clause. We would be shirking our duty to evaluate legislation in light of the Constitution's requirements if we excised doubtful phrases by ingenuously labelling them "superfluous." *Cf.* the dissent in *Dellinger, supra,* 472 F.2d at 412–416. Second, the truncated version would be subject to the same objections. The Government's duty to prove scienter would be insufficient to save the statute. As the defendants point out, "[i]f intentional conduct could save all statutes from facial invalidity, then the doctrine of facial invalidity could hardly have arisen."

■ A theory of statutory construction which the Government for some reason did not urge is nevertheless of sufficient potential applicability as to require us to address our attention to it. That theory, the doctrine of *ejusdem generis,* has been capsulized as follows:

"Where general words follow the enumeration of particular classes of persons or things, the general words, under the rule or maxim of construction known as 'ejusdem generis,' will be construed as applicable only to persons or things of the same general nature or class as those enumerated, unless an intention to the contrary is clearly shown." 82 C.J.S. Statutes § 332b, at 658 (1953).

Of more particular interest for the present case, the above text states:

"The rule finds application and has frequently been applied where such terms as 'other,' 'any other,' 'others,' 'or otherwise,' or 'other thing' follow an enumeration of particular classes, and where this occurs such words are to be read as 'other such like,' and are construed to include only others of like kind or character." *Id.* at 662. (Footnotes omitted.)

On first reading it might appear that the above would be dispositive of the present constitutional issue. However, the determination of whether *ejusdem generis* is applicable to a particular statute is not that simple a matter.

Thus, in Gooch v. United States, 297 U.S. 124, 56 S.Ct. 395, 80 L.Ed. 522 (1936), the Court had for resolution the question of whether holding an officer to avoid arrest was within the meaning of "held for ransom or reward or otherwise" in the Federal Kidnaping Act. Just as in the present case, the words "or otherwise" had been added to the original statute by amendment. The defendant contended that the rule of *ejusdem generis* applied and that "otherwise" therefore referred to some pecuniary consideration or payment of something of value. The Court, however, while noting that penal statutes are to be narrowly construed and that the rule of *ejusdem generis,* although well-established, is only an instrumentality for ascertaining the correct meaning of words when there is uncertainty, held that the words added by the amendment sufficiently broadened the statute to include the nonpecuniary situation there involved.

A similar result was reached in United States v. Alpers, 338 U.S. 680, 70 S. Ct. 352, 94 L.Ed. 457 (1950). The Court had before it a case in which the Court of Appeals had invoked the rule of *ejusdem generis.* "Since the words 'book, pamphlet, picture, motion-picture film, paper, letter, writing, print' ap-

pearing in the statute refer to objects comprehensible by sight only, the court [of appeals] construed the general words 'other matter of indecent character' to be limited to matter of the same genus. The Court of Appeals held phonograph records without the statute, so interpreted, since phonograph records are comprehended by the sense of hearing." 338 U.S. at 682, 70 S.Ct. at 354.

The Supreme Court reversed, holding that the rule of *ejusdem generis* if applied would defeat the obvious purpose of the legislation.

Similarly, the defendant's contention that the rule was applicable to restrict the meaning of "other writing" was rejected in Goldsmith v. United States, 42 F.2d 133 (2d Cir. 1930), cert. denied, 282 U.S. 837, 51 S.Ct. 26, 75 L.Ed. 743.

On the other hand, in a civil case, Clarke v. Gold Dust Corp., 106 F.2d 598 (3d Cir. 1939), cert. denied, 309 U.S. 671, 60 S.Ct. 614, 84 L.Ed. 1017 (1940), the court held that under the rule the phrase "or other corporation" employed in a statute must be restricted to corporations similar to those enumerated in the statute.

Finding it somewhat difficult to ascertain clear guidelines from the foregoing cases and declining to find any significance either in a civil-criminal dichotomy or in a theory that the courts would only not apply the rule of construction when it would result in a reversal of a criminal conviction, we turn to an authoritative textbook for general principles for the application of the rule.

"The doctrine applies when the following conditions exist: (1) the statute contains an enumeration by specific words; (2) the members of the enumeration constitute a class; (3) the class is not exhausted by the enumeration; (4) a general term follows the enumeration; and (5) there is not clearly manifested an intent that the general term be given a broader meaning than the doctrine requires.

"A 'class' is an artificial creation to provide ease in dealing with numerous items with similar characteristics. Thus 'a class' is a generalization which accurately or inaccurately associates items for a particular purpose or treatment. Without some objective or purpose classification is impossible. Consequently, the rule of *ejusdem generis* depending as it does on pure form provides a dangerous yardstick with which to measure the statutory coverage which the legislature intended.

"The restrictive effective [sic] of the rule of *ejusdem generis* is consistent with the nineteenth century suspicion of statutory change. It is another manifestation of the rule that statutes in derogation of the common law should be strictly construed. Usually the legislative intent is directly contrary to the result obtained by the *ejusdem generis* rule. The legislative intent is to enumerate specific objects or conditions which have come to their attention, but this enumeration is not intended to limit the operation of the statute to the specific objects set forth. They provide express examples of the problem; the legislative intent is to regulate *the problem* and not the *enumeration*." 2 J. Sutherland, Statutes and Statutory Construction § 4910, at 400–1 (3d ed. by F. Horack, 1943) (footnotes omitted).

Upon the basis of the foregoing as elaborated upon by the subsequent explanatory text, §§ 4911–14, we conclude that the doctrine is not applicable here. We note the following specific factors. (1) The terms preceding the general term "otherwise" are general and in their generality contain no particular aspects of diversity of meaning. (2) The preceding terms substantially embrace the characteristic which they both describe, thereby indicating that the phrase "or otherwise" would take a meaning beyond the class. (3) The application of the rule would render the general words substantially meaningless for the reason there is nothing *ejusdem generis* to fall within their purview.

(4) The contrary intent is apparent in the words here involved.

By way of elaboration upon the last point, which apparently has been considered a crucial one, *e. g.*, in United States v. Alpers, *supra,* we turn to cases and legislative history involving Section 462(a). As we have noted hereinbefore, at least one appellate court has rejected a restrictive construction of the present statutory provision. United States v. Eberhardt, *supra.* A pre-amendment decision, Bagley v. United States, 136 F.2d 567 (5th Cir. 1943), is pertinent to this matter. The indictment there charged that the defendant did

> "knowingly, unlawfully and feloniously hinder and interfere by force and violence with the administration of this Act [Selective Training and Service Act of 1940] . . . and did . . . make to and in the presence of [three witnesses] . . . a threat to inflict bodily harm upon the members of Local Board No. One . . . ." 136 F.2d at 568 n. 2.

The Court of Appeals reversed the conviction, holding that the indictment did not allege and the proof adduced did not make out the offense. It stated:

> "The language in which the act was couched was not put there by accident or inadvertence. It was carefully chosen by Congress . . . in order to insure, the fullest preservation of freedom of opinion and expression, that the act would not be the instrument of partisan prosecution to suppress that freedom, and that prosecutions under it would be brought only where there was forcible rather than ideological opposition to the draft . . . . [T]he force and violence charged were the mere utterance of words under circumstances which could not amount to acts of force and violence, hindering and interfering with the draft board in the performance of its duties." 136 F.2d at 569, 570.

The defendant had said that he was "100% for Hitler," had destroyed an occupational questionnaire, and had boasted that he would destroy the next questionnaire sent him.

Clearly, the Government had attempted to prosecute defendant Bagley for speaking. And, although the basis for the appellate court's reversal is somewhat ambiguous, the thrust of the opinion is that the statutory prohibition of forceful and violent means did not encompass the "mere utterance of words," at least absent circumstances showing that the threatener was capable of and intended to carry out his threats physically to harm the board members.

*Bagley* was one of only two cases involving the challenged portion of the statute between 1940, when the original statute was passed, and 1948, when the words "or otherwise" were added. That addition was the only significant, substantive change. In Senate Report No. 1268 of May 12, 1948, 80th Cong., 2d Sess., it was stated:

> "This subsection [section 12(a)] provides the same penalties for violations of the provisions of this legislation as were provided for violations of the 1940 act, and is substantially a reenactment of section 11 of that act. Certain changes of language have been made to incorporate judicial determinations made pursuant to the predecessor act."

The defendants contend that this legislative history in light of *Bagley* reflects that "Congress intended to enlarge the scope of the statute so as to abridge First Amendment rights." We decline to ascribe this malevolent purpose to Congress. However, we do find it clear that Congress did intend the words "or otherwise" to be meaningful, not just superfluous. Having rejected *ejusdem generis*, we must find that the words, whether or not Congress specifically meant them to be so, are sufficiently broad to include interference or hindrance by protected expression.

■ The Government's other "solutions" to the problems the challenged clause raises are also inadequate. As we

noted before, its sanguine assurance that prosecutors will not misuse the statute does not obviate the disturbing fact that the statute's coverage includes privileged activity. The Government's argument that if abuses do occur the courts will rectify them deserves more extended comment.

It is clear that there is no "absolute" right to freedom of expression. The Government may impose certain limitations on even clearly First Amendment-protected conduct; regulation of time, place, and manner, for example, is permissible. See, *e. g.*, Adderley v. Florida, 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966); Cox v. Louisiana, 379 U.S. 536, 554–555, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965); Kovacs v. Cooper, 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513 (1949). Thus, although a statute restricts the exercise of certain First Amendment rights, the statute is not necessarily invalid. The determination whether a given law is unconstitutional requires a subtle analysis that takes into account a variety of factors, including a balancing of competing interests and goals, those of the Government and those of the individual.

We are of the opinion that a decision that the challenged clause is unconstitutional in a particular case would not establish whether the clause would be deemed unconstitutional in other situations. In other words, because of the wide range of activities that the clause encompasses and the special considerations relevant to each situation, it is likely that no single opinion resolving a case or controversy can clearly and coherently delineate the division between constitutional and unconstitutional applications. Consequently, although we have held that the challenged provision of Section 462(a) is not overly vague on its face, we think that, in reference to conduct privileged under the First Amendment, it fails to give adequate guidance both to potential actors and to law-enforcement officials. "A person contemplating action within the literal scope is left in doubt whether his claim of privilege will be upheld, unless his situation is on all fours with that of an earlier claimant. To be rid of doubt he must be able not only to predict and assess the context and consequences of planned action, but also must guess how events will be reflected on a cold record in a reviewing court." Note, The First Amendment Overbreadth Doctrine, 83 Harv.L.Rev. 844, 872 (1970).

Apparently only one other court has ruled on the constitutionality of the challenged portion of Section 462(a). In United States v. Farinas, 308 F.Supp. 459 (S.D.N.Y.1969), conviction affirmed on appeal, 448 F.2d 1334 (2d Cir. 1971), cert. denied, 405 U.S. 934, 92 S.Ct. 946, 30 L.Ed.2d 810 (1972), the defendant unsuccessfully challenged the clause in a motion to dismiss the indictment. The indictment had charged him, *inter alia*, with having violated the provision "in that after being warned that activity disruptive of the processing of other registrants would constitute a felony he had persisted in such activity by making speeches, distributing literature and engaging in boisterous and unruly behavior." 308 F.Supp. at 462.

In a cursory discussion, the district court "resolved" the constitutional issues by approving language from United States v. Spock, 416 F.2d 165, 173 n. 20 (1969), wherein the First Circuit had rejected a challenge to another clause of Section 462(a) and had disposed of the overbreadth argument urged there by stating it is "[t]he court's obligation . . . to make sure that such a statute does not improperly infringe upon speech in any particular instance." After quoting from *Spock* the *Farinas* court concluded that whether the defendant's conduct was privileged "must await development of the facts upon trial." 308 F.Supp. at 466–67. The *Farinas* decision thus avoids the difficult questions that Judge Fairchild in *Dellinger, supra,* stated a court must face and which we, in the present case, have tried to answer.

In United States v. Dellinger, *supra,* 472 F.2d at 357, it was stated:

"The doctrine of overbreadth applies when a statute lends itself to a substantial number of impermissible applications, such that it is capable of deterring protected conduct, when the area affected by the challenged law substantially involves first amendment interests, and when there is not a valid construction which avoids abridgment of first amendment interests." (Footnotes omitted.)

As we indicated in the foregoing discussion, we think that the present case meets the criteria for the application of the overbreadth doctrine. The challenged clause of Section 462(a) is unconstitutional on its face.

■■■ We do not lightly decide to invalidate a congressional enactment.[8] However, we are convinced that Congress, in seeking to promote what is undoubtedly a valid governmental interest, namely, the smooth administration of the Selective Service Act, legislated too broadly. We stress that we are *not* holding that Congress may not protect that legitimate interest. We do hold that the challenged provision's substantial curtailment of the citizens' right to exercise peacefully their First Amendment liberties—liberties so cherished that we accord them "preferred status" —is an improper remedy. Not only does the "or otherwise" provision reach privileged conduct and arguably privileged conduct, but it admits of no reasonable construction limiting the wide range of its application to such conduct. In short, the Congress paid insufficient attention to the constitutionally-mandated requirement of precision in drafting so as to avoid or to minimize conflict with First Amendment rights. An overinclusive proscription resulted.

We are of the opinion the better procedure is that of invalidating the clause now rather than choosing to pursue the alternative course of overturning particular invalid applications one by one as they arise. Under these circumstances, we find it unnecessary to determine whether the challenged clause is invalid as applied to the defendants here.[9]

"The traditional and 'restrained' approach when . . . [a statute's warning may extend too far] is to judge the statute in terms of the result worked by its application in the case before [the] court. In those instances, however, where statutes clearly warn that constitutionally protected expressive activity *will be,* or even, with some degree of vagueness, warn that such activity *may be* penalized, the courts have recognized a 'chilling effect,' or deterrence of protected expression which requires more drastic judicial treatment of the statute . . . . . [T]he high value attached to uninhibited expression, and the acknowledgment of its sensitive nature, have produced exceptions to the usual judicial attitude toward statutes questioned on constitutional grounds.

"*First,* there is not a requirement that the person attacking the breadth of the statute demonstrate that his own conduct in issue and within the proscription of the statute could not constitutionally be regulated by a statute narrowly drawn . . . .

"*Second,* . . . [i]n those instances of overbreadth where 'no readily apparent construction suggests itself as a vehicle for rehabilitating the statutes in a single prosecution

8. Our finding of invalidity is restricted to the "hinder or interfere" clause of Section 462(a). That clause is clearly separable from the rest of Section 462(a), and we express no opinion as to the constitutionality

of the other provisions of the statute.

9. Our holding that the challenged clause is unconstitutional on its face also makes it unnecessary for us to reach the other issues raised on this appeal. (See footnote 2, *supra.*)

We do note, however, that the issue regarding the "*Allen*-type" charge has been decided adversely to the position of the defendants in the recent *en banc* decision of this court in United States v. Silvern, 484 F.2d 879 (7th Cir., 1973).

. . .,' the whole statute must be declared a violation of the first amendment, and void for all applications.

"*Third,* in a first amendment case the range of construction to avoid overbreadth is significantly narrowed.

. . . In first amendment cases . . . [the] presumption [that the statute was meant to operate only within the limits of legislative power] is either greatly weakened or dropped. . . ." United States v. Dellinger, 472 F.2d at 355–356 (emphases in original; footnotes omitted).

*See also* Grayned v. City of Rockford, 408 U.S. 104, 106–107, 114, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); Kunz v. New York, 340 U.S. 290, 71 S.Ct. 312, 95 L.Ed. 280 (1951); Thornhill v. Alabama, 310 U.S. 88, 98, 60 S.Ct. 736, 84 L. Ed. 1093 (1940); Note, The First Amendment Overbreadth Doctrine, 83 Harv.L.Rev. 844 (1970). Our decision, as we initially stated, implies no condonation of the defendants' actions.

Accordingly, the judgments of conviction of defendants Baranski, Clark, Kruetz, and Lubbers are reversed. The case is remanded for proceedings consistent with this opinion.[10]

Reversed and remanded.

APPENDIX TO THE COURT'S OPINION

COUNT IV

The MAY 1971 GRAND JURY further charges:

1. On or about April 29, 1971, at Evanston, in the Northern District of Illinois, Eastern Division,

JOHN WAYNE BARANSKI, THOMAS PETER CLARK, EILEEN MARIE KRUETZ, and MARY ELIZABETH LUBBERS

defendants herein, did willfully, knowingly, and unlawfully conspire, combine, confederate and agree together, and with each other, and with divers other persons to the Grand Jurors unknown, to commit an offense against the United States, to wit:

To willfully injure and commit depredations against property of the United States, in violation of Title 18, United States Code, Section 1361;

To willfully and unlawfully remove, mutilate, obliterate, destroy and attempt to do so, certain records, papers, documents, files, and registration cards filed and deposited in a public office of the United States, in violation of Title 18, United States Code, Section 2071;

To willfully hinder and interfere with the administration of the Military Selective Service Act of 1967, in violation of Title 50 Appendix, United States Code, Section 462(a).

2. It was part of said conspiracy that the defendants and co-conspirators would enter Local Draft Boards 98, 99 and 100 of the Selective Service System located at 912 Chicago Avenue, Evanston, Illinois on April 29, 1971 and would remove from the file cabinets therein official files of the Selective Service System and tear them and throw them on the floor.

3. It was further a part of said conspiracy to deface, mutilate, obliterate and destroy official files of the Selective Service System by entering Local Draft Boards 98, 99 and 100 of the Selective Service System located at 912 Chicago Avenue, Evanston, Illinois and by then pouring a red, liquid substance over files

10. Although we reverse the judgments of conviction, we note that the securing of a new indictment containing no reference to a conspiracy to violate the clause of 50 U.S.C. App. § 462(a) successfully challenged here and limited to constitutionally valid "ob- jects" would be permitted. *Cf.* United States v. Beard, 414 F.2d 1014, 1017 (3d Cir. 1969). We express no opinion as to whether the Government should pursue such action.

thrown on the floor and in the file cabinets so as to render said files unfit for official use.

4. It was further a part of said conspiracy that the defendants would contact certain individuals and notify them to be present at a certain time and in a certain place with a camera and a notebook in order to record the occurrence.

5. In furtherance of the aforesaid conspiracy and to effect its objectives and purposes, the defendants did commit the following overt acts:

### OVERT ACTS

1. All of the acts of each and all of the said defendants described in Counts I through III inclusive of this indictment are hereby realleged and incorporated by reference herein and are hereby designated as overt acts in furtherance of and to effect the objects of the conspiracy.

2. On or about April 29, 1971, at Evanston, in the Northern District of Illinois, Eastern Division, John Wayne Baranski, Thomas Peter Clark, Eileen Marie Kruetz, and Mary Elizabeth Lubbers placed and caused to be placed in the office of Local Draft Boards 98, 99 and 100 of the Selective Service System located at 912 Chicago Avenue, Evanston, Illinois, approximately 15 pink envelopes containing a yellow letter entitled "Letter to Evanston Draft Board Members", and dated April 29, 1971 and signed "The Four of Us, John Wayne Baranski, Thomas Peter Clark, Eileen Marie Kruetz, Mary Elizabeth Lubbers." Also placed in the office of Draft Boards 98, 99 and 100 was a letter to "Dear Friends" dated April 29, 1971 and signed "In Love and Hope for peace, The Four of Us" with signatures, John, Eileen, Mary Beth, and Thom. The reverse side of this letter is entitled "Fact Sheet Biographies" and set forth a biography of each of the four signatories of the above letter.

All in violation of Title 18, United States Code, Section 371.