**Eugene HOWELL, Petitioner,**

v.

**UNITED STATES, Respondent.**

**No. 68 C 1995.**

United States District Court
N. D. Illinois, E. D.

May 1, 1969.

**1018**

Harvey Silets, Chicago, Ill., for petitioner.

Thomas A. Foran, U. S. Atty., N. D. Ill., for the United States.

### MEMORANDUM OPINION

Petition for Writ of Habeas Corpus

MAROVITZ, District Judge.

This is a petition for writ of habeas corpus, 28 U.S.C. § 2255, wherein petitioner seeks to have vacated a 1964 conviction for conspiracy to violate the narcotics law, 21 U.S.C. § 174. Petitioner was tried before a jury, convicted, and sentenced to twelve years imprisonment. Judgment was affirmed on appeal, United States v. Owens, 346 F.2d 329 (7th Cir. 1965), cert. denied 382 U.S. 878, 86 S.Ct. 163, 15 L.Ed.2d 119 (1965). Petitioner is presently incarcerated in the Federal Penitentiary, Terre Haute, Indiana.

Petitioner has already filed a petition to vacate his conviction alleging that he was mentally incompetent during his trial because of his use of drugs and that certain statements which were admitted at trial were made involuntarily and should not have been admitted. Judge Decker rejected both contentions. Howell v. United States, 282 F.Supp. 246 (N.D.Ill.1968). An appeal is presently pending from that decision.

In the instant action, petitioner contends that the recent decision of Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), made retroactive by Roberts v. Russell, 392 U.S. 293, 88 S.Ct. 1921, 20 L.Ed.2d 1100 (1968), sets forth the rule that in a joint trial any out of court statement of an alleged co-conspirator which implicates another co-conspirator is inadmissible even if a cautionary instruction would be given by the court. He suggests that the guarantee of the Sixth Amendment to the United States Constitution that an accused "be confronted with the witnesses against him," as expounded in *Bruton,* was denied to him at his trial.

The *Bruton* decision, however, is not as expansive as petitioner would have us believe. In overruling Delli Paoli v. United States, 352 U.S. 232, 77 S.Ct. 294, 1 L.Ed.2d 278 (1956), *Bruton* held that, at a joint trial, the introduction into evidence of a co-defendant's incriminating extrajudicial statements may violate a defendant's right to confrontation and cross-examination. Given the particular factual circumstances of the case, the Supreme Court concluded that the cautionary instructions given by the judge to the jury with respect to disregarding the implicating statements were ineffective and could not overcome the great risk that defendant's case would be prejudiced because the jury would or could not follow the instructions. The risk of prejudice was so substantial that the Court held the defendant was denied his right to confrontation. 391 U.S. 123, 127–128, 88 S.Ct. 1620.

The *Bruton* decision then, does not say that all hearsay is inadmissible as to all co-conspirators. Rather, it hinges on

two key points: one, that the incriminating hearsay statement "was clearly inadmissable against (defendant) under traditional rules of evidence" and two, that the trial court's instructions could not overcome the risk of prejudice to defendant. 391 U.S. at 128, 88 S.Ct. at 1624. The court emphasized that

> "There is not before us * * * any recognized exception to the hearsay rule insofar as petitioner is concerned and we intimate no view whatever that such exceptions necessarily raise questions under the Confrontation Clause." *Id.*

Secondly, it recognized that in some cases the error of admitting inadmissible hearsay will not be reversible error because a court's limiting instructions will be easily understood and followed. Id. at 135, 88 S.Ct. 1620. See, e. g., Frazier v. Cupp. 394 U.S. 731, 89 S.Ct. 1420, 22 L. Ed.2d 684 (April 22, 1969); United States v. Levinson, 405 F.2d 971, 988 (6th Cir. 1968); United States v. Catino, 403 F.2d 491, 496 (2d Cir. 1968).

■■■ It is the first of these two points which distinguishes petitioner's case from the *Bruton* decision. Petitioner was indicted on a conspiracy charge. Under the general rule, one co-conspirator's declarations in furtherance of the conspiracy are admissible against his co-conspirators. Lutwak v. United States, 344 U.S. 604, 617, 73 S.Ct. 481, 97 L. Ed. 593 (1953); Krulewitch v. United States, 336 U.S. 440, 444, 69 S.Ct. 716, 93 L.Ed. 790 (1952); Schine Chain Theatres, Inc. v. United States, 334 U.S. 110, 116–117, 68 S.Ct. 947, 82 L.Ed. 1245 (1948); United States v. United States Gypsum Co., 333 U.S. 364, 393, 68 S.Ct. 525, 92 L.Ed. 746 (1948); Evans v. Dutton, 400 F.2d 826, 831 (5th Cir. 1968); United States v. Battaglia, 394 F.2d 304, 313 (7th Cir. 1968); United States v. Sapperstein, 312 F.2d 694, 698 (4th Cir. 1963). This hearsay exception has been accepted for a long while. Clune v. United States, 159 U.S. 590, 593, 16 S.Ct. 125, 40 L.Ed. 269 (1895); Mattox v. United States, 156 U.S. 237, 243–244, 15 S.Ct. 337, 39 L.Ed. 409 (1895); Logan

v. United States, 144 U.S. 263, 308–309, 12 S.Ct. 617, 36 L.Ed. 429 (1892); United States v. Gooding, 25 U.S. (12 Wheat.) 460, 468–470, 6 L.Ed. 693 (1827). Consequently, and in contrast to the statements which were admitted in *Bruton*, the hearsay statements in the instant case were, under the traditional rules of evidence, admissible against petitioner.

The Supreme Court in *Bruton* gave no indication, and we think none is warranted, that evidence admitted under a hearsay exception necessarily violates the Sixth Amendment confrontation clause. While the right to confrontation is framed as an absolute, the right has always been seen in its historical relation with and as an integral aspect of the general rule against the admission of hearsay evidence. McCormick, Evidence §§ 19, 223–25, 231 (1954); 5 Wigmore, Evidence §§ 1364–71, 1395–1418 (3d ed. 1940) (hereafter Wigmore). Semerjian, The Right of Confrontation, 55 A.B.A.J. 152 (1969); Comment, Federal Confrontation: A Not Very Clear Say on Hearsay, 13 U.C.L.A.L.Rev. 366, 372 (1966); Comment, Preserving the Right to Confrontation—A New Approach to Hearsay Evidence in Criminal Trials, 113 U. Pa.L.Rev. 741, 746 (1965).

Historically indistinguishable from and the essence of the right of confrontation is the right of cross-examination. Douglas v. Alabama, 380 U.S. 415, 418–419, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1964); Pointer v. Texas, 380 U.S. 400, 404, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1964); 5 Wigmore § 1395. Now because "(t)he right to subject opposing testimony to cross-examination is the right to have the Hearsay rule enforced," and because the hearsay rule admits of exceptions, Professor Wigmore concludes that

> "(t)he rule sanctioned by the Constitution is the Hearsay rule as to cross-examination, with all the exceptions that may legitimately be found, developed, or created therein." *Id.* § 1397.

While it has been said that "the Supreme Court has never fully articulated federal standards required by the con-

frontation clause in a hearsay evidence context," Comment, *supra*, 113 U.Pa.L. Rev. 741, 744, it has, on several occasions, more than alluded to the relationship. In Snyder v. Massachusetts, 291 U.S. 97, 107, 54 S.Ct. 330, 333, 78 L.Ed. 674 (1934), Justice Cardozo recognized that "the privilege of confrontation at (no) time (has) been without recognized exceptions * * *." Regarding the right and these recognized exceptions, the purpose of the confrontation clause of the Sixth Amendment, "this court often has said, is to continue and preserve that right, and not to * * * disturb the exceptions." Salinger v. United States, 272 U.S. 542, 548, 47 S.Ct. 173, 175, 71 L.Ed. 398 (1926). Specifically discussing the conspiracy exception to the hearsay rule, the Supreme Court, in Delaney v. United States, 263 U.S. 586, 590, 44 S.Ct. 206, 68 L.Ed. 462 (1924), held that the conspiracy exception did not deny a defendant his right of confrontation.

Thus, because the Court in *Bruton* explicitly disclaimed any adverse inference as to the viability of recognized exceptions to the hearsay rule under the confrontation clause, because the Court has always recognized the admissibility of some hearsay exceptions, Pointer v. Texas, 380 U.S. 400, 407, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1964), because the conspiracy exception is a well established rule often invoked by the Court, and because the Court has, at least on one occasion, held that that specific hearsay exception is not in conflict with the confrontation clause, we must reject petitioner's claim that an implicating hearsay of a co-conspirator is inadmissible.

■■ Petitioner also attacks his conviction by asserting that his right of confrontation was denied in that at the time each of the out of court statements was alleged to have been made, petitioner had, as a matter of law, withdrawn from the conspiracy. The indictment in this case charged that the conspiracy started on November 1, 1962, and continued to May 5, 1963. On February 14, 1963, petitioner and a co-conspirator,

Robert Owens, were arrested by Pennsylvania state police for a traffic violation on the Pennsylvania Turnpike. Eventually, heroin was discovered in petitioner's possession, and he was charged by state authorities with illegal possession of narcotics. Petitioner ultimately pleaded guilty to the state charge, was fined, and given probation. He now contends that this state arrest constituted a withdrawal from the federal crime of conspiracy and that his statements following his arrest and the statements which co-conspirators made with reference to the arrest of petitioner and Owens were inadmissible.

While the law is clear that an "arrest or incarceration *may* constitute a withdrawal from a conspiracy, it does not follow that in every instance it *must*." United States v. Agueci, 310 F.2d 817, 839 (2nd Cir. 1962), cert. denied Guippone v. United States, 372 U.S. 959, 83 S.Ct. 1013, 10 L.Ed.2d 11 (1962). In most of the cases to which petitioner refers as examples of situations wherein an arrest did constitute a withdrawal from a conspiracy, the arrest was for the crime of conspiracy. Gay v. United States, 322 F.2d 208, 209 (10th Cir. 1963); Cleaver v. United States, 238 F.2d 766, 768 (10th Cir. 1956); United States v. Cohen, 197 F.2d 26 (3d Cir. 1952). However, in the instant case, as in United States v. Agueci, 310 F.2d 817, 838 (2nd Cir. 1962), the arrest which is said to have constituted withdrawal from the conspiracy was not for the crime of conspiracy, but for another violation. As possession of narcotics and conspiracy to violate the narcotics statutes are separate and distinct crimes, *Id.* at 828, an arrest for violation of a state narcotics possession charge does not logically constitute withdrawal from a conspiracy in violation of federal law. Thus, it cannot be said that petitioner withdrew from the conspiracy until he was arrested in early May, 1963, in Chicago, Illinois, on the federal conspiracy charge.

Finally, under the standard phrasing of the co-conspiracy exception, to be ad-

missible, the incriminating statements must be in furtherance of the conspiracy. Commentators now recognize that the furtherance requirement is rarely literally applied to restrict admissible evidence to those statements which were made to advance the conspiracy, but is generally invoked to include any statement of a co-conspirator which is relevant to the conspiracy and is made during the course of the conspiracy. Comment, The Hearsay Exception for Co-conspirators' Declarations, 25 U.C.L. Rev. 530, 531 n. 5 (1958). The Uniform Rules of Evidence, Rule 63(9) (b) adopts such a position. The statements about which petitioner complains were made while the conspiracy plan was still in existence. Even under a literal view of the furtherance doctrine, it is clear that the incriminating statements made by co-conspirators were in furtherance of the conspiracy in that they were made to explain delays in consummating transactions or to lend moral support to a potential seller. The statements were admissible as to petitioner.

The petition for writ of habeas corpus is denied.

**UNITED STATES of America,
Plaintiff,**

**v.**

**1.16 ACRES, MORE OR LESS, IN the CITY OF STAMFORD, COUNTY OF FAIRFIELD, STATE OF CONNECTICUT and Arthur E. Doane, et al., Defendants.**

**Civ. No. 11202.**

United States District Court
D. Connecticut.

June 24, 1969.

Stewart H. Jones, U. S. Atty., District of Connecticut, by David Margolis, Asst. U. S. Atty., Hartford, Conn., for United States of America.

Slavitt & Connery, Norwalk, Conn., for Trio Const. Co., Inc.; Abraham D. Slavitt and Robert G. Zanesky, Norwalk, Conn., of counsel.

MANSFIELD, District Judge.*

In this action pursuant to various acts of Congress (40 U.S.C. § 258a and acts supplementary thereto and amendatory thereof; 33 U.S.C. § 592; and 33 U.S.C. § 701) for the condemnation of a tract of 1.16 acres of land for a local harbor flood control project in Stamford, Conn., the sole issue presented for trial, which was held on June 10, 12 and 13, 1969, was the amount to be paid to Trio Construction Company, Inc. ("Trio" herein) as just compensation for that portion of the condemned acreage known as Tract No. 35, owned by Trio.

The essential undisputed facts are as follows: Tract No. 35 is a pie-shaped piece of land, 3,042 square feet in acreage, forming a part of a larger irregularly shaped piece of land, 25,446 square feet in acreage, owned by Trio and located at the corner of Seaview Avenue and White Street, Stamford, Connecticut. On December 10, 1965, the Acting Secretary of the Department of the Army filed in this Court a Declaration of Taking of the aforementioned 1.-16 acres, including Tract 35, for the purpose of constructing a stone hurricane barrier as part of a harbor flood control project known as the "Stamford Harbor Protection Project, Stamford, Connecticut." Trio thereupon became entitled as just compensation to the fair market value of Tract 35 and any loss in fair market value of the residue of the larger piece of land owned by Trio resulting from the taking, fixed according to the highest and best use to which the property was adapted at the time of the taking. United States v. Jones Beach State Pkwy. Authority, 255 F.2d 329 (2d Cir.), cert. denied, 358 U.S. 832, 79 S.Ct. 55, 3 L.Ed.2d 71 (1958). Both sides agree that the measure of just compensation should be the difference between the fair market value of the entire piece of land, including Tract 35, before and after the taking. In this connection "fair market value" is defined as the price that would be paid in a competitive market, under all conditions requisite to a fair sale resulting from negotiation between a willing buyer and seller, each acting prudently, with knowledge of the essential facts and without undue pressure. Westchester County Park Comm. v. United States, 143 F.2d 688 (2d Cir.), cert. denied, 323 U.S. 726, 65 S.Ct. 59, 89 L.Ed. 583 (1944).

The highest and best use for the land owned by Trio prior to the taking was as a site for a garden-type residential apartment building. In fact Trio had acquired the property on June 16, 1965 for $50,000 for just such use; plans and specifications for a 26-unit garden-type apartment had been drawn, a building permit had been obtained from the City

---

* Of the Southern District of New York sitting by designation.

of Stamford, test holes had been drilled on the property, and some bids had been obtained and some contracts entered into with respect to various aspects of the proposed apartment house. Construction of the apartment house as designed by Trio, however, was rendered impracticable by the taking for the reason that the Government's harbor flood control project, which has since been completed, called for a hurricane wall on White Street and a ramp on Seaview Avenue that would have (and has since had) the effect of eliminating all ingress and egress from the land except for a 25-foot strip along Seaview Avenue. We must therefore first determine the fair market value of the entire piece of land as of December 10, 1965, the date of the taking.

■■■ Although determination of fair market value of a parcel of land is not controlled by rigid rules or formulas and each case must be decided on its own facts, normally the most persuasive evidence of value is a recent sale of the land being condemned or of comparable property in the same vicinity, provided such sales are not too remote and the conditions in the case of comparable sales are substantially similar to those existing at the time of taking. United States v. Miller, 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336 (1943); United States v. 18.46 Acres, 312 F.2d 287, 288 (2d Cir.1963). In addition to comparable market data, however, we may consider other evidence of value such as cost, rental or other income derived from the land, and prospective income, particularly where comparable market value is unavailable or of doubtful probative value. Olson v. United States, 292 U.S. 246, 257, 54 S.Ct. 704, 78 L.Ed. 1236 (1934); United States v. Meadow Brook Club, 259 F.2d 41 (2d Cir.), cert. denied, 358 U.S. 921, 79 S.Ct. 290, 3 L.Ed.2d 239 (1958); United States v. 1.108 Acres of Land, 204 F.Supp. 737 (E.D.N.Y.1962). The weight to be given to opinion evidence based on such other methods of determining value depends, of course, on the nature of the data or estimates upon which such evidence is founded. United States v. 25.406 Acres of Land, 172 F.2d 990 (4th Cir.), cert. denied, 337 U.S. 931, 69 S.Ct. 1496, 93 L.Ed. 1738 (1949). In short, any opinion, whether derived from comparable sales, cost or income (past or prospective) is only as convincing as the foundation data upon which it rests.

Trio called as expert witnesses two real estate appraisers, Peter C. Robinson and Francis G. Brennan, who testified that the value of Tract 35 at the time of the taking was $98,917 and $106,000, respectively. Although there were some differences in the analytic approaches of these two witnesses, both utilized the same fundamental method. Both determined the residual value of the land as if the apartments planned by Trio had already been constructed and were earning income. This method required the appraisers to postulate the cost of the construction project, the rental income to be derived from the apartments, and the operating expenses which would be incurred. After determining the annual net income, the proportion of that amount attributable to the improvements was calculated and the remainder was capitalized to determine the residual value of the land.

■ ■ Although the Court of Appeals for the Second Circuit has held it to be improper to value property "as if it were actually being used for the more valuable purpose," United States v. Meadow Brook Club, supra, 259 F.2d at 45, the adaptability of a particular tract to a more profitable use, and estimates of income to be derived from it as a site for such use, may properly be considered as factors affecting its fair market value. United States v. 25.406 Acres, supra, 172 F.2d at 995. While specific plans, including the obtaining of necessary zoning changes and a building permit, had here been completed, an examination of the underlying bases of the conclusions of Trio's experts discloses the dangers in attempting to value property by capitalization of estimated possi-

ble future income from apartments not yet constructed.

Such substitution of speculation in place of actuality can result in valuations that are too tenuous to be entitled to much weight. A fundamental problem encountered in the use of the "cost-income" approach in the case of an apartment still in the planning stage is that a relatively slight error in prognistication with respect to the estimated cost, income, or operating expenses of the prospective enterprise results in a disproportionately large variation in the ultimate residual land value. By way of example in the present case, an increase in construction costs of $50,000 would reduce the land value calculated by Robinson to about $29,500 and Brennan's calculated value to about $41,800. In other words, an increase of about 25% in construction costs (not an unusual occurrence in the period of rising construction costs experienced by this country over the past 10 years) would have reduced the residual land values arrived at by these experts by approximately 70% and 62%, respectively.[1] Furthermore, with respect to the Robinson appraisal an increase in operating expenses or a decrease in rental income of $1,000 would result in a corresponding decrease in land value of over $15,000; a similar deviation would decrease the Brennan appraisal by over $14,000.[2] Furthermore, there were factors entering into the relevant cost, income, and expense calculations which made it likely that substantial adjustments in the figures would be required after actual construction and operation of the apartment complex. The appraisers relied largely upon cost figures submitted to them by Trio, of which many were based upon estimates rather than upon an actual contract price. There was also testimony that the cost figures failed to account sufficiently for Trio's return on its service as general contractor for the construction project. The rental income and operating expense figures were not based upon actual experience but upon what amounts to informed guesses. In light of the uncertain nature of this underlying data and the disproportionate effects on residual land value that any error in the underlying data would have, little if any weight can be given to the calculations of defendant's experts based on the cost-income capitalization approach to value.[3]

The government also called an appraiser, Norman R. Benedict, who testified that the value of the land as of the time of the taking was about $40,000, based upon comparisons with the selling

---

1. The annual net income determined by Robinson was $24,835. Of this $18,406 was attributed to return on the improvements; a $50,000 increase in construction costs would, however, increase this return to $22,906. The income allocable to the land would be reduced to $1,929 which, capitalized at Robinson's rate of 6.5%, would yield a land value of $29,500, or approximately 30% of Robinson's $98,917 figure.

   The annual net income determined by Brennan was $24,923, of which $17,494 was attributed to the improvements. A $50,000 increase in construction costs would increase the amount attributed to improvements to $21,994 thus reducing the income allocable to land to $2,929. This latter amount, capitalized at Brennan's 7% rate would result in a land value of $41,800 which is about 38% of Brennan's $106,000 figure.

2. These figures are obtained by capitalizing $1,000 at Robinson's 6.5% rate and Brennan's 7% rate, respectively.

3. For instance, Trio planned to finance construction of the proposed apartment through a bank mortgage loan approximating $200,000 for which an application was made. At a 6.5% interest rate the annual debt service on this loan would amount to $13,000, reducing Trio's estimated net income from the prospective enterprise to less than $12,000. Experts called by both sides differed as to how this charge should be treated in calculating net income for capitalization purposes, and whether the risk involved in such a speculative venture called for a higher rate of return.

prices of what he regarded as comparable parcels of land. Although his method is not as fraught with peril as the approach of defendant's experts, a problem is posed in the utilization of comparable sales in this case by the fact that three of the comparable sales occurred at least 18 months before the taking while the fourth occurred about 21 months after the taking. Furthermore, the apartments erected on the land involved in the comparable sales differed substantially in size and design from those planned by Trio. Although the government expert's appraisal is based upon more certain data than the appraisals of Robinson and Brennan, we conclude that we cannot be bound by any of the appraisals submitted by either party in reaching our determination of value.

The one sale which appears to us of dominant relevance in determining land value here is the sale of the subject property itself to Trio at a price of $50,000 on June 15, 1965 (or about six months before the taking) pursuant to a contract signed April 26, 1965. At the time of that sale both the seller and buyer were aware of the highest and best use of the land. Neither party was under pressure to sell or buy and neither was unwilling to enter into the transaction. The sale, therefore, was the type upon which a determination of market value may be based—a sale between a willing buyer and willing seller each acting free from pressure and with full knowledge of the pertinent facts. We, furthermore, find it appropriate to add to this $50,000 figure an increase in value resulting from Trio's formulation of plans and obtaining of a building permit. We do not believe that the increase in value approaches the estimates testified to by defendant's experts for the reason that it was well known when Trio bought the land what the highest and best use was, and zoning for such use had been secured before the April 26, 1965 contract. Furthermore the plans were drafted and building permit was obtained in short order, the latter being issued on May 12, 1965. However, we do conclude that the existence of the plans and issuance of the permit would have influenced a buyer to pay approximately an additional $5,000 for the land in December, 1965, since it had been made clear that such a project was feasible and would be allowed by the city.[4] In addition, all witnesses were in agreement that 1965 was a year of rising real estate values generally in the relevant market. For this reason we find it appropriate to add an additional $2,000 to the value of the subject property to reflect the general upward trend in the market.

We, therefore, conclude, after having viewed the property, studied the appraisals submitted by the experts in the light of their testimony, and heard the testimony of the owners of Trio as to their dealings with respect to the property, including their obtaining the property six months prior to the taking for $50,000, their plans for its development, and the steps already taken toward improvement by the time of the taking, that the preponderance of the evidence establishes that the fair market value of the property at the time of the taking was $57,000.

█ It is next necessary to determine the value of the portion of the tract remaining after the taking. There was a dispute among the experts as to the present highest and best use of the property. Mr. Benedict was of the opinion that garden apartments may still be profitably built upon the land, while defendant's experts agreed that the land

---

4. In this connection we have considered the evidence that Trio incurred expenses of about $15,000 in obtaining the plans and other preliminary steps. While there cannot be compensation for the amount of these out-of-pocket expenses since the government did not appropriate the arch- itectural drawings or other plans formulated by or for Trio, the steps taken toward commencement of the project have been considered insofar as they would enhance the value of the land itself to a prospective buyer.

**1026**

is, in its present state, suitable only for storage or parking use. On the basis of our view of the property and the testimony of both the experts and the owners of Trio we conclude that the preponderance of the evidence indicates that the land is probably not suitable for apartment use. Access and ingress has been severely curtailed by the construction of the hurricane wall and the elevation of Seaview Avenue. White Street has been completely eliminated, and sewer connections eliminated on that street and made very difficult on Seaview Avenue. While the 25-foot opening on Seaview Avenue might be usable as a single entrance and exit for automobiles and pedestrians, it would render the site undesirable as an apartment site, probably resulting in lower rentals. This factor, coupled with the increased costs accompanying the restriction on ingress and egress would probably render the project uneconomic. Very little evidence was adduced at trial as to the value of this land for the purpose of parking or storage. Mr. Robinson merely reduced the unit value per square foot of the land according to his calculations by 85% and made the appropriate adjustment. Mr. Brennan did attempt to postulate the income which would be earned from seasonal parking of cars on the premises as well as storage of boatyard or marine equipment, but did not attempt an alternative calculation based upon boat storage, although he did suggest this as an alternative. We conclude that an efficient use of this parcel for an optimum combination of car and boat or other marine equipment storage would yield an income in excess of Mr. Brennan's estimate by a modest amount, sufficient to increase the fair market value of the land to $13,000.

We conclude that the value of the land before the taking was $57,000, the value of the remainder after the taking was $13,000, and that, therefore, Trio is entitled to just compensation in the amount of $44,000.

Settle order.

Lewis **COLE, Eleanor Raskin, Thomas D. Hurwitz, Robert H. Roth, Columbia Chapter of Students for a Democratic Society, suing on their own behalf and on behalf of all other individuals and/or organizations similarly situated,** Plaintiffs,

v.

The **TRUSTEES OF COLUMBIA UNIVERSITY IN the CITY OF NEW YORK,** Defendants.

No. 69 Civ. 2355.

United States District Court
S. D. New York.

June 4, 1969.

Kunstler & Kunstler, Lubell & Lubell, New York City, Nancy Stearns, Newark, N. J.; William M. Kunstler, Arthur Kinoy, David G. Lubell, Jeremiah S. Gutman, New York City, of counsel.

Thacher, Proffitt, Prizer, Crawley & Wood, New York City, for defendants; John W. Wheeler, New York City, of counsel.

Robert M. Morgenthau, U. S. Atty., for Southern District of New York, New York City, for the Government; Michael D. Hess, Asst. U. S. Atty., New York City, of counsel; David Katsky, Asst. U. S. Atty., New York City, on brief.

## OPINION

TENNEY, District Judge.

This is a motion brought on by the plaintiffs, Columbia University Chapter of Students for a Democratic Society, and certain of its members, suing on behalf of other individuals and/or organizations similarly situated, for an order, pursuant to Rule 65(a), (b) of the Federal Rules of Civil Procedure, restraining the defendants, The Trustees of Columbia University (hereinafter referred to as "the Trustees"), from disclosing, revealing or delivering any books, records, reports, correspondence, membership lists, associational information or other documents specified in a subpoena duces tecum served upon the Trustees by the Permanent Subcommittee on Investigations of The Committee on Government Operations of the United States Senate. The Trustees, rather than risk contempt of Congress, for failure to comply with this subpoena issued by the Subcommittee, intend to release the material requested on June 5, 1969.

The underlying cause of action seeks a declaratory judgment, pursuant to Title 28, United States Code, Section 2201, declaring the subpoena duces tecum [1]

1. Pg. 2. The body of the subpoena requires the Trustees to:

"* * * produce any and all records for the period from January 1, 1968 to the present date showing the identity of students or other persons or organizations who took part in the seizure of Columbia University buildings or parts thereof without the permission of university authorities, as well as records showing the identity of officers and faculty advisers of Columbia University student organizations including Columbia University Students for a Demo-

cratic Society, Students for a Restructured University, Student Afro-American Society, Hamilton Hall Steering Committee. Also records showing the extent and nature of assistance of any type rendered during this period of time by any agency of the United States Government or by any legal entity exempt by United States law from taxation, to any student or other person whose name is provided in compliance with the terms of this subpoena."