UNITED STATES of America,
Plaintiff-Appellee,

v.

John Michael DONNER et al.,
Defendants-Appellants.

No. 18812.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 3, 1972.

Decided May 3, 1974.

Rehearing and Rehearing En Banc
Denied July 10, 1974.

James W. Williams, Chicago, Ill., James E. Wilson, Richard M. Handlon, Midland, Mich., David J. Colman, Bloomington, Ind., Brent A. Barnhart, Indianapolis, Ind., for defendants-appellants.

Stanley B. Miller, U. S. Atty., John E. Hirschman, Asst. U. S. Atty., Indianapolis, Ind., for plaintiff-appellee.

Before SWYGERT, Chief Judge, HASTINGS, Senior Circuit Judge, and PELL, Circuit Judge.

PELL, Circuit Judge.

This is an appeal from a judgment of conviction entered in the Southern District of Indiana against eight defendants named in a four-count indictment. It has been brought to our attention that the defendant Trost is deceased. Subsequent to the conviction, the defendant Mulert became (and apparently remains) a fugitive. We consider the appeal of the remaining six defendants.

Count I of the indictment as returned by the Grand Jury charged the defendants with a conspiracy to violate 18 U. S.C. § 1361,[1] 18 U.S.C. § 2071,[2] and 50 U.S.C. App. § 462(a),[3] all in violation of 18 U.S.C. § 371, the conspiracy statute.[4]

---

1. 18 U.S.C. § 1361·reads:
 "Whoever willfully injures or commits any depredation against any property of the United States,' or of any department or agency thereof, or any property which has been or is being manufactured or constructed for the United States, or any department or agency thereof, shall be punished as follows:
 If the damage to such property exceeds the sum of $100, by a fine of not more than $10,000 or imprisonment for not more than ten years, or both; if the damage to such property does not exceed the sum of $100, by a fine of not more than $1,000 or by imprisonment for not more than one year, or both."

2. 18 U.S.C. § 2071 reads in pertinent part:
 "(a) Whoever willfully and unlawfully . . . mutilates, obliterates, or destroys, or attempts to do so, . . . any record, proceeding, map, book, paper, document, or other thing, filed or deposited . . . in any public office . . . of the United States, shall be fined not more than $2,000 or imprisoned not more than three years, or both."

3. 50 U.S.C. App. § 462(a) reads, in pertinent part, that
 ". . . any person or persons who shall knowingly hinder or interfere or attempt to do so in any way, by force or violence or otherwise, with the administration of this title . . . or the rules or regulations made pursuant thereto, or who conspires to commit any one or more of such offenses, shall, upon conviction in any district court of the United States of competent jurisdiction, be punished by imprisonment for not more than five years or a fine of not more than $10,000, or by both such fine and imprisonment . . . ."

4. The allegation in Count I that defendants had conspired to violate 18 U.S.C. § 1361 was excised from the indictment by the district court because the dollar amount of the damage to government property was not specified in the count.

This count alleged, *inter alia*, that it was part of the conspiracy that the defendants would enter the Marion County, Indiana, headquarters of the Selective Service System in Indianapolis, Indiana, "and would remove and thereupon deface, mutilate, obliterate and destroy official files and records of the Selective Service System contained therein by ripping, tearing and applying black paint to said official files and records."

Counts II, III, and IV respectively charged the defendants with substantive violations of 18 U.S.C. § 1361, 18 U.S.C. § 2071, and 50 U.S.C. App. § 462(a), the three sections of the statutes which were originally denominated as the objects of the Count I conspiracy.

All the defendants were found guilty in a jury trial on each count. Each defendant was sentenced to an executed sentence of four years on Counts I, III, and IV, the terms to run concurrently, plus a fine for each defendant of $5,000.00 under Count II.

### I

Some time during the evening of October 31, 1969, or during the early morning hours of the following day, the Marion County, Indiana, headquarters of the Selective Service System was the subject of a destructive visitation. During the course thereof, some 135,000 registration cards were scattered about the office; file drawers were pulled open and the contents, including data furnished by registrants, were indiscriminately thrown about; numerous documents were torn and mutilated; and large ledgers containing classification records had had either the pages torn apart completely or the books had been fanned open and sprayed with black paint. Repairing the damage took until March 1970 at a cost of approximately $30,000.

The damage was first discovered by an Indianapolis policeman at approximately 6:00 A.M. on November 1. He had responded to a radio call, which had followed a telephone call a short time earlier to a newsman at a local radio-television station. Later the same day this newsman, as well as other persons in news media in the area, received by special delivery mail copies of a statement which had been affixed to the Selective Service office door at some time prior to the arrival of the policeman.

The statement generally was critical of the involvement of this country and its resources in foreign wars, particularly that in Vietnam, and referred to various claimed governmental discriminations. In part, the statment read as follows:

"The destruction of the records of the Indianapolis draft boards is an attempt to call to the attention of the American people the extent to which the government is betraying the ideals of justice and freedom embodied in the documents on which this country was founded.

" . . . . .

" . . . . This is not the first time that a draft board is destroyed by Americans concerned about the future of the nation. We hope that this action will encourage many others to take all the necessary steps to make this nation a republic of, by, and for the people.

"In due time we will reveal our identities. We are not criminals ashamed of our action. We are sure that the destruction of draft records has some of the qualities inherent in the actions of our founding fathers. We trust that the American people will vindicate us.

Beaver 55"

It appears that all of the defendants (the eight named in indictments subsequently issued) were in Washington, D. C., on the weekend of November 14–16, 1969, where they participated in a press conference at which they may have released materials identifying themselves as the Beaver 55. Inasmuch, however, as this appearance does not seem to loom large in the contentions of the parties,

we will proceed to the city of Indianapolis, where a press conference was held on November 20, 1969. All eight defendants were present and sat at a table in the front of a room before some 40 persons, half of whom were from the news media.

Defendant Mack, after welcoming those in attendance, said, "I will first introduce the members of the group and then I will read a statement that we have prepared and then the whole group will be open to questions from the press."

After the introductions by name and address, Mack read a statement which in part was as follows:

"We are the Beaver 55. We are single and married, workers and students, young and old. We started from different parts of the country and ended up together in Chicago. We are together in our actions, in our love and our responsibility—a community of active resistance. We claim responsibility for the actions against the Selective Service offices in Indianapolis, Indiana, on October 31.

"Some of us completely destroyed 1–A and 1–A delinquent draft files and ledger books in 44 local boards in the Indianapolis Metropolitan Area.

"We have done this because, we are not blinded by the lies that corporations attempt to pawn off on us.

\* \* \* \* \* \*

"We have done this because, we will no longer tolerate this madness. We will no longer tolerate any form of conscription to kill. We will no longer tolerate the Christians' 'just war', the liberals' cries for 'honorable peace.' We put our hope in life, and our lives in hope and will continue to actively resist any system which obstructs those goals.

\* \* \* \* \* \*

"These actions must continue; the spirit of the people will not be overcome.

"PEACE, Michael Donner, Jane Kennedy, Paul Mack, Connie Grubbs McNamara, Marty McNamara, Jo Ann Mulert, Tom Trost, David Williams."

The press conference then continued in question-and-answer form. All eight of the persons whose names appeared on the statement, which was not only read aloud but was distributed to those present, remained throughout the somewhat lengthy session.[5] Five of the six appellants answered questions or volunteered statements. The husband of the sixth appellant, who did not speak, participated.

Throughout the session, the word "we" was frequently used, and we discern no direct disclaimer of responsibility for the particular action at the Indianapolis Selective Service board offices. Thus, the following pronouncements are noted:

"We are perfectly prepared to pay, or to serve our time in jail, because we expect that, that is what will happen to us. . . . "[I]t's not a matter of guilty or innocence, it's a matter of . . . responsibility. We claim that we are responsible for our actions. . . . We hope that by our action and our willingness to go to jail other people will see that this is the kind of commitment to the movement. . . . [W]e destroyed paper and paperwork . . . property that has no right to exist . . . and taking that property . . . destroying that property, that paperwork, you know, is not violent at all. . . . [T]o talk about why we have done what must seem to many many people an extreme action. . . . [O]urs is thought of as a vanguard action. . . . We are the Beaver 55. . . . [Draft sta-

5. The statement also contained a reference to "some of us" entering the computation research center of Dow Chemical Company in Michigan and destroying magnetic tapes and processing cards there. The Michigan portion was excised when evidence was submitted to the jury regarding the conference and the statement.

tus] was in no way a part of my consideration . . . was not a factor in making the decision. . . . Well, these eight people came together and they felt that we should take this type of action and we did. . . . There have been a number of other actions in other cities where other people have come together and taken similar actions. . . . Everybody's bank account has been dwindled rapidly as the result of having to be on the road and being involved in this sort of thing. . . . [Y]ou are asking why we revealed our identities. . . . [I]n reference to his question about how we only have eight, it's because we have known each other and we have been a community for a long time. . . . [I]nvolvement by American people who are concerned has to go farther than marching. . . . [W]e have found that definitely more extreme measures are going to have to be taken and that is why we have taken this action. . . . The draft files that were destroyed in Indianapolis, no person can be legally inducted from the metropolitan area of Indianapolis until all these files are restored in their exact order, which is going to take them a long, long time; especially because some of these files are missing and I think that speaks, that also, not only to the fact that we can be effective through this kind of disruption . . . ."

The above statements were interspersed in a context of condemnation of the federal government, particularly as it was manifested in the Selective Service System and because of its involvement in the Vietnam war. The question before the trial jury, however, was not whether the motivation of the eight was sincere, nor indeed whether their condemnations might or might not have been justified. The jury was to determine whether the defendants were guilty or innocent of the crimes charged in the indictment. While the words spoken at the press conference were not entirely free of elements of tergiversation, the utterances in the joint context were susceptible of conveying a clear message that there was participation by all eight in the planning of the destructive action, and its actual accomplishment, as principals or aiders and abettors.

 In addition, other evidence introduced as to individual defendants justifies our holding, which is that we cannot say that the jury's verdict was not supported by sufficient evidence of guilt.[6] We turn then to whether there may have been other reasons for reversing the judgments of conviction. The claimed willingness to endure incarceration for their cause having now apparently flagged, we are presented with several claims of error.

## II

However, before considering the contentions advanced by the appellants, it is necessary that we, on our own motion, determine whether reversal is required by the decision of this court in United States v. Baranski, 484 F.2d 556 (7th Cir. 1973). In that case, argued and decided subsequent to oral argument in the present case, we reversed the convictions of defendants who had gone to an Illinois draft board during office hours and had opened drawers and filing cabinets, pulled some records and poured animal blood over them. The basis of the reversal was the unconstitutionality of the portion of 50 U.S.C. App. § 462(a) that the defendants here are charged with violating substantively in Count IV and with conspiring, inter alia, to violate in Count I.

This prima facie similarity is sufficient to call for a more detailed analysis of Baranski to determine the extent to

---

6. The district court in its thorough and searching instructions charged the jury as to various aspects of "admissions" attributable to the party making them, including, "A person accused of a crime cannot be convicted upon trial upon a voluntary or involuntary admission. A voluntary admission must be corroborated by other credible evidence."

which it is controlling in the present appeal, at least insofar as Counts I and IV are concerned.

In *Baranski*, as in the present case, the defendants were indicted in four counts, one conspiracy count and three substantive counts, involving the same three sections of the statute as here. While there may have been evidence that the defendants in *Baranski* committed acts violative of the three statutory sections charged substantively—the Government argued strenuously that there was no question of it—the jury acquitted them on all three of these counts, and the posture of the case in this court, therefore, was in effect that acts violative of the three sections of the statutes charged substantively had not been sufficiently proven. The *Baranski* jury did convict the defendants of conspiring to violate the three statutory sections which they were found not to have violated in fact.

■ It, of course, is recognized that the crime of conspiracy is concerned with an agreement to violate the law and does not require accomplishment of the violation agreed upon in order for a defendant to be found guilty. It is clear in *Baranski* that the events in the draft board did not happen spontaneously but by agreement among the defendants. The planning was specific, including an advance call to a member of the news media who accompanied the defendants to the board office. The question then remained just what did the *Baranski* defendants agree to do if they did not agree to hinder and interfere with the administration of the Military Selective Service Act by force and violence (50 U.S.C. App. § 462(a)), nor agree to commit willful damage to property of the United States (18 U.S.C. § 1361), nor agree to remove, mutilate, and de-stroy records of the United States (18 U.S.C. § 2071). The record in *Baranski* provided no basis for our concluding that the defendants had not accomplished at least one object of their conspiracy agreement.

The substantive § 462(a) indictment count before the *Baranski* jury charged hindrance and interference "by force, violence *and* otherwise." The conspiracy count merely charged that one of the statutes the defendants had conspired to violate was § 462(a). The statute does not use the word "and" but is phrased "by force or violence or otherwise." We were thus compelled to reach the conclusion in *Baranski* that the jury may have based, and probably did base in view of their verdicts of not guilty on the substantive counts, their guilty verdict on "otherwise" conduct, a term sufficiently broad to sweep within its ambit protected First Amendment communication. This interpretation was fortified by the prosecutor's argument to the jury that force and violence were not required for conviction.

We do not have this problem in the present case. The jury found, and its finding was supported by ample evidence, that the defendants were guilty of substantive violations of 18 U.S.C. § 2071 (mutilation, etc., of records and books filed and deposited in a public office of the United States).[7] With the specific substantive violations found to have existed, that these did not just occur but came about through advance agreement, *i. e.*, a conspiracy, is obvious.

■ We therefore find applicable here, as we could not in *Baranski*, the principle enunciated in United States v. Tanner, 471 F.2d 128, 139–140 (7th Cir. 1972), cert. denied, 409 U.S. 949, 93 S. Ct. 269, 34 L.Ed.2d 220, *i. e.*, that convictions on a conspiracy count are not

7. As previously noted, the jury in the present case also found the defendants guilty of substantive violations of 18 U.S.C. § 1361 (depredations against property of the United States). This conviction does not enter into our consideration of the issue before us inasmuch as the district court excised that particular statute as an object of the conspiracy from the indictment. While the inclusion of § 1361 would have strengthened the parallelism and emphasized the differences between the present case and *Baranski*, the exclusion does not weaken the significance of the differences that do exist.

affected "so long as any one of the objects of the conspiracy is unchallenged." In *Baranski,* the defendants could not challenge the fact that they were guilty of conduct which hindered and interfered "otherwise" than by force and violence. We therefore hold that *Baranski* does not require a reversal of the conspiracy count in the present case.

■ While beyond any argument in the present case there was substantial evidence of hindrance and interference by force and violence to support a jury conviction under the substantive count based on § 462(a), our *Baranski* problem on Count IV is not the same as that which relates to the conspiracy count. Here, as in *Baranski,* the substantive crime is charged as having been accomplished "by force *and* otherwise." It is clear that while the defendants in the present case were committing destructive acts clearly violative of the force and violence portion of § 462(a) they were also engaged in an attempt to communicate to the public their opinions on the wrongness of certain governmental activities.

We find guidelines for the disposition of the present issue in Street v. New York, 394 U.S. 576, 89 S.Ct. 1354, 22 L. Ed.2d 572 (1969). In that case, involving the burning of an American flag, the Court, speaking through Mr. Justice Harlan, stated, "Moreover, even assuming that the record precludes the inference that appellant's conviction might have been based *solely* on his words, we are still bound to reverse if the conviction could have been based upon *both* his words and his act." *Id.* at 587. (Emphasis in the original.) Here, we cannot say that on the particular substantive count the jury may not have convicted on the combination of words and acts. We are not at liberty as we are in the case of the conspiracy count to disregard a particular object of the conspiracy where there is an amplitude of proof of agreement on other viable and constitutionally permissible objects. We therefore reverse the conviction on Count IV.

## III

Turning to the contentions advanced by the defendants, we first address ourselves to the argument that their convictions on the conspiracy count should be overturned because of a variance from the indictment by the Government in its proof. Each of the seven overt acts alleged in support of the conspiracy count occurred, by the terms of the indictment, "[o]n or about October 31, 1969." The Government, nonetheless, and the trial judge as well, took the position at trial that the press conference of November 20th was arguably a continuation of the conspiracy made out in the indictment. Relying upon the co-conspirator exception to the hearsay rule, the district court accordingly refused to uphold the defendants in their objection to the general admission of inculpatory statements made by some of them individually on November 20th, and the court left it to the jury to decide whether the conspiracy charged was in effect on that date.

■ The true inquiry in cases like this is not merely whether the proof at trial wandered from the charges made in the indictment. To be error, the variance must, in addition, be such as to "affect the substantial rights" of the accused. Berger v. United States, 295 U. S. 78, 82, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). The cases have found this in situations where a defendant is surprised by the introduction of evidence at trial which is detrimental to his defense, or is left unprotected against a second prosecution for the same offense. United States v. Cassell, 452 F.2d 533, 536 (7th Cir. 1971).

■ The former circumstance is the one which defendants liken to their case; had they known, they assert, that the indictment encompassed a conspiracy continuing up to and beyond the day of the press conference, their mode of defense would have been "substantially different." We cannot agree, however, that any rights of the defendants were substantially affected. First, there can

be little doubt that counsel for the defendants were aware, even before trial, that the Government had evidence of the press conference and would seek to introduce it at trial. If surprise arose, it was in connection with the legal theory upon which the Government sought to introduce the evidence, not with the fact of its attempted introduction. And the record is clear that defense counsel, upon being apprised of the continuing conspiracy view of the prosecution, was amply aware of its significance to the defense, for objection was timely made and overruled. Further, the fact that defendants were deprived, by the claimed obscurity of the indictment, of an opportunity to file a motion to quash the conspiracy count in part is not a fit basis upon which to find prejudice to them, for they exercised what was essentially the same option midway through trial when they objected to the introduction of evidence of the press conference. The trial judge overruled them because he thought that the scope of the conspiracy was an issue for the jury, not because defendants had earlier failed to file a motion to quash.

The defendants on appeal state that while they have no quarrel with the use by the prosecution at trial of press conference statements insofar as those statements were used in an attempt to prove that the defendants admitted having committed the acts of destruction of Government records on October 31–November 1, 1969, error existed in the jury's being permitted to consider the possibility of a continuing conspiracy. The argument here relies on recent First Amendment cases, such as Brandenburg v. Ohio, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969); defend-

ants assert that in the press conference they were within the protection of the First Amendment, merely advocating action which did not present a clear and present danger.

■ While that which occurred at the November 20th press conference constituted words rather than action, constitutionally protected speech may nevertheless be an overt act in a conspiracy charge. United States ex rel. Epton v. Nenna, 446 F.2d 363, 368 (2d Cir. 1971), cert. denied, 404 U.S. 948, 92 S.Ct. 282, 30 L.Ed.2d 265.

We conclude that the variance in proof from the indictment was at worst a harmless surprise to the defendants. Reversal will not stand on this ground.[8]

■ The defendants argue that even though the rules of conspiracy law allow conspirators to be found guilty on the basis of acts of their co-conspirators, analysis of the evidence as to the individual defendants is required. What the defendants seem to be seeking here is to have us weigh the evidence, particularly the alibi evidence. We do not deem this to be the function of the reviewing court once we have determined, as we have here, that there was not such an insufficiency of evidence as to require reversal.

The above contention of the defendants is based upon the premise that the district court in instructing on conspiracy utilized what is sometimes referred to as a *Pinkerton* instruction. The court also instructed according to the aiding and abetting statute, 18 U.S.C. § 2.[9]

In Pinkerton v. United States, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), two brothers were convicted of conspiracy to evade taxes and of specific

8. Even if the conspiracy were assumed *arguendo* to have been confined timewise to the date specified in the indictment, a strong case would be presented for a group confession under the circumstances of the joint press conference and its connotations of full ratification by all present of all that was said. In such case it would appear that the ratification would reach the agreement in-

volved in the conspiracy as well as showing either direct participation or aiding and abetting in the substantive crimes. We do not, however, need to decide this issue.

9. 18 U.S.C. § 2(a):
 "Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."

tax evasions. One of the brothers, Daniel, took an appeal to the Supreme Court, arguing that the other brother had committed the substantive offenses while he, Daniel, was in jail, and that the trial judge wrongly instructed the jury that it could convict him of the tax evasions of his brother if he were found to have conspired with his brother while in jail. The Supreme Court upheld the instruction, stating:

"[W]hen the substantive offense is committed by one of the conspirators in furtherance of the unlawful project . . . [t]he criminal intent to do the act is established by the formation of the conspiracy. Each conspirator instigated the commission of the crime. The unlawful agreement contemplated precisely what was done. It was formed for the purpose. The act done was in execution of the enterprise. The rule which holds responsible one who counsels, procures, or commands another to commit a crime is founded on the same principle. That principle is recognized in the law of conspiracy when the overt act of one partner in crime is attributable to all. An overt act is an essential ingredient of the crime of conspiracy . . . . If that can be supplied by the act of one conspirator, we fail to see why the same or other acts in furtherance of the conspiracy are likewise not attributable to the others for the purpose of holding them responsible for the substantive offense." 328 U.S. at 647.

The defendants do not challenge the *Pinkerton* holding as incorrect law nor do we consider it as not having continuing viability. Our question here, however, is initially as to the correctness of the premise that a *Pinkerton* instruction was given. The portion of the court's extensive and thorough instructions which the defendants apparently believe incorporated the *Pinkerton* holding was contained in the court's instruction No. 33:

"You are not to consider what one person may have said or done in concluding whether or not another person was a member of the conspiracy partnership; his or her membership must be established by evidence as to his or her own conduct, what he or she said or did in becoming a member. But, if you find from the evidence beyond a reasonable doubt that the alleged conspiracy was formed and existed and that two (2) or more of the alleged conspirators were members thereof, then the alleged acts and omissions thereafter, if any, knowingly done, and the statements thereafter, knowingly made, if any, by any member of the alleged conspiracy, may be considered by you as evidence in the case as to any of the other members of the alleged conspiracy, even though such acts and omissions and statements may have occurred in the absence and without the knowledge of such others, provided such acts or omissions and statements were knowingly done, omitted or made during the continuance of such conspiracy before its termination and in furtherance of one or more of the alleged objects or purposes of the alleged conspiracy. Otherwise, any admission or incriminatory statement made outside of Court by one person may not be considered as evidence against any person who was not present and heard the statement made."

■ We find nothing more in this portion of the instruction than a statement of well-established law relating to the co-conspirator exception to the hearsay rule. See, *e. g.,* McMahan v. United States, 424 F.2d 1216, 1219 (7th Cir. 1970), cert. denied, 400 U.S. 826, 91 S.Ct. 51, 27 L.Ed.2d 55.

Even if this portion of the jury charge could be construed to present the phase of *Pinkerton* adverted to above, in the absence of a reversal of the conspiracy conviction we would find no reversible error in giving such an instruction.

■ Even if the conspiracy convictions were to be reversed, the particular instruction here given would be insufficient to taint the convictions based upon substantive Counts II and III. Instruc-

tion No. 33 pertains only to the conspiracy count, and we will not assume that the jury would have interpreted it otherwise.[10] While the particular instruction is long and complex, occupying some 12 pages of the transcript, we cannot give it any reasonable construction other than that it pertained solely to the ramifications of the conspiracy count and conspiracy law and was not applicable to the jury determination of the issues presented by the substantive counts. Further, the jurors did not have to carry the intricate legal message to their deliberation room in their memories as the court sent the instructions to the jury room. Finally, we note that elsewhere in the instructions the jury was admonished that "[a] voluntary admission or confession after the commission of a crime and in the case of the crime of conspiracy, after the termination or abandonment thereof, constitutes evidence only against the person making it. It must not be considered as evidence against a co-defendant, and must be disregarded by the jury in determining the guilt or innocence of a co-defendant."

We have not concerned ourselves with defendant Mack's solo appearance on a radio talk show during which he responded to a question by stating, "One action I took was destroying draft files in Indianapolis." Testimony as to this was admitted as to Mack alone, and the other defendants were adequately protected by the admonitory instruction just quoted.

■ Defendant Williams contends that there was reversible error in the judge's reference to the source of the name "Beaver 55" as being a publication which Williams had worked on with his mother. Whether this was a proper inference from the evidence we need not determine. The statement was made out of the hearing of the jury and could not be the basis of a reversal.

■ Williams also urges reversal because of the exclusion of testimony by James Douglass, a visiting professor on Nonviolence at the University of Notre Dame. After the professor had testified as to his background, a hypothetical question was posed to him involving some of the facts brought out in evidence concerning the evening of October 31-November 1 and the November 20th press conference. At the conclusion of the statement of hypothetical facts, he was asked whether he had an opinion which "could explain their quote [at the press conference] 'claiming responsibility' under those circumstances." Objection was made to the question on the ground it did not include all of the facts that had been presented in evidence, that it invaded the province of the jury, and that some of the facts were not accurately stated. While not deciding that more than one of the grounds of objection may not have been well taken, we note that the trial court rested the sustaining of the objection on the basis that explaining what the defendants meant by "claiming responsibility" was not the subject for expert testimony. We agree. Further, any claim of reversible error is obviated here by the fact that there was no offer to prove what the testimony would be [11] and the

---

10. "Appellate courts should be slow to impute to juries a disregard of their duties . . . ." Fairmount Glass Works v. Cub Fork Coal Co., 287 U.S. 474, 485, 53 S.Ct. 252, 255, 77 L.Ed. 439 (1933).

11. A statement was made during a side bar conference indicating a desire to present evidence as to the philosophy, purposes, and methods of a Christian non-violent movement. While such evidence might be explicative of the motivation of the defendants and even lend some apparent support to their position that what they were doing was for the good

of humanity as they conceived it, the statement does not validate as admissible evidence an expert opinion as to what the defendants may have meant by "claiming responsibility." The issue at the trial was not defendants' motivation but whether they had violated certain statutes of the United States.

In United States v. Eberhardt, 417 F.2d 1009, 1012 (4th Cir. 1969), cert. denied, 397 U.S. 909, 90 S.Ct. 907, 25 L.Ed.2d 90 (1970), the defendants in a factually comparable case were permitted to present evi-

fact that the witness was withdrawn with the observation that he might be recalled. He was not thereafter returned to the stand.

Williams also asserts in support of his own nonparticipation in the destruction occurring at the draft board offices certain alibi testimony and the claim that the statement passed out at the press conference which he attended only had his typed name at the end and no handwritten signature. However, two FBI agents testified that he had said he had signed the Beaver 55 statement. The argument appears to ignore the applicability of the aiding and abetting statute, and, in any event, a question of credibility was presented which was resolved against Williams.

Williams further contends that there was reversible error in the failure of the district court *sua sponte* to sever him from the trial. Factually, this claim appears to be based on the situation that Mack's confession was put into evidence, Mack did not take the stand, and all of the defendants were represented jointly by a team of three attorneys.[12]

The present claim of error is primarily predicated on Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), and Schaffer v. United States, 362 U.S. 511, 80 S.Ct. 945, 4 L.Ed.2d 921 (1960), as cited and quoted in United States v. Gougis, 374 F.2d 758 (7th Cir. 1967).

We do not find *Bruton* applicable. In that case, the Supreme Court concluded that cautionary instructions given by the trial court to the jury with respect to disregarding implicating statements of a co-defendant were ineffective and could not overcome the great risk that the defendant's case would be prejudiced because the jury would or could not follow the instructions. This issue was raised in Howell v. United States, 300 F.Supp. 1017 (N.D.Ill.1969), and was thoroughly analyzed by Judge Marovitz, who, *inter alia,* pointed out that *Bruton* explicitly stated that no exception to the hearsay rule was involved in the case before the Court. In affirming the *Howell* conviction, this court expressly adopted Judge Marovitz's opinion and approved the reasons set forth in his opinion. Howell v. United States, 442 F.2d 265, 275 (7th Cir. 1971). In the present case, as we have already observed, the well-established exception to the hearsay rule applicable to a co-conspirator's statement is involved.

It is clear from *Schaffer-Gougis* that even though a defendant does not move for severance, which is the situation in the present case, the trial judge has a continuing duty to sever if prejudice appears during trial in a situation where proof of the conspiracy count has failed on a multi-count indictment. Here, the conspiracy count did not fail. It is settled that severance rests in the discretion of the trial judge, subject to correction only if there has been an abuse of discretion. United States v. Echeles, 352 F.2d 892 (7th Cir. 1965). The unsupported possibility that favorable testimony might be elicited from a separated co-defendant, who thereby could be used as a witness, does not make denial of a motion for severance erroneous. United States v. Johnson, 426 F.2d 1112, 1116 (7th Cir. 1970), cert. denied, 400 U.S. 842, 91 S.Ct. 86, 27 L.Ed.2d 78. No greater duty should be imposed in the absence of a motion. Williams, while claiming prejudice, provides little, if any, support for the claim. Under these circumstances we are not prepared to hold that there was an abuse of discretion in not severing Williams. United States v. Kahn, 381 F.2d 824

---

dence that their actions were taken pursuant to a good faith belief in the immorality and illegality of the Vietnam war, but they were not allowed to present expert testimony as to the reasonableness of those beliefs.

12. While the brief for Williams refers to the statements of several of the defendants, primary emphasis appears to be placed on Mack's confession, presumably referring to Mack's solo radio talk show appearance subsequent to the press conference during which he made a first-person confession. Evidence as to this confession was admitted as to Mack alone and the jury was properly instructed.

(7th Cir. 1967), cert. denied, 389 U.S. 1015, 88 S.Ct. 591, 19 L.Ed.2d 661.

While the defendant Mack adopted by reference all of the issues raised in behalf of his co-defendants, his brief in this court was devoted solely to a Sixth Amendment claim of deprivation of effective assistance of counsel. From the record it appears that all defendants, including Mack, retained two Indianapolis attorneys to represent them. During the pretrial period various motions were filed by the attorneys on behalf of Mack individually, particularly with regard to the amount of his bond and his desire to travel outside the jurisdiction. On the first morning of trial, the judge observed that a Chicago attorney, Julius Sherwin, had entered an appearance for all of the parties except Mack. The attorney stated he now proposed to appear for Mack also. The trial judge called Mack to the podium and interrogated him as to his wishes that this attorney also represent him, whether he was asking for a continuance, whether he had conferred with the attorney, whether there had been sufficient consultation time, and whether he was ready for trial. Mack responded in the affirmative. Thereafter, during the course of the trial, Sherwin made a not inconsiderable effort to keep out of evidence highly incriminating materials seized at Mack's apartment, a matter as to which only Mack had standing.

While it is no doubt true that prejudice to a defendant from the failure to have effective assistance of counsel results whether counsel is court-appointed or selected by the accused, unless there are facts constituting a waiver, Craig v. United States, 217 F.2d 355, 359 (6th Cir. 1954), we need not make any inquiry as to whether there was any waiver resulting from the manner of retention of counsel or from the failure to raise this question in the trial court. We here find no demonstrable prejudice.

■■■ Per se violation of the Sixth Amendment does not result from joint representation of co-defendants. United States v. Williams, 429 F.2d 158, 160 (8th Cir. 1970), cert. denied, 400 U.S.

947, 91 S.Ct. 255, 27 L.Ed.2d 253. The claimed prejudice was directed at remarks made by Sherwin, who apparently acted as chief trial counsel, although the Indianapolis attorneys also participated in the trial throughout its duration. It has not been demonstrated that any of the remarks were made in the presence of the jury; they occurred during colloquies between Sherwin and the judge. Our examination reflects that some of the remarks did partake of candor, but honesty and forthright recognition of clearly established facts may well as a matter of trial strategy provide a better defense than a dissimulative distortion of that which is patent and virtually beyond argument.

There can be no argument that the clearest case of guilt established by the evidence was that against Mack. As this court said in a comparable case, United States v. Gallagher, 437 F.2d 1191, 1194 (7th Cir. 1971), cert. denied, 402 U.S. 1009, 91 S.Ct. 2190, 29 L.Ed.2d 430, "The mere fact that the evidence against appellant's co-defendant . . . is stronger than that against the appellant does not indicate, much less demonstrate, the existence of a conflict of interest between the defendants." In that case, as in the present case, the particular appellant was apparently the dominant member of the conspiracy and played a more prominent role in carrying out the illegal activities involved. This court held that because a difference in the weight of the evidence against co-defendants may cause counsel to speculate as to the trial strategy he should employ does not itself serve to establish that counsel is unable effectively to represent both defendants.

Under the tests laid down in United States v. Stevens, 461 F.2d 317, 319 (7th Cir. 1972), cert. denied, 409 U.S. 948, 93 S.Ct. 292, 34 L.Ed.2d 218, we decline to engage in a process of critiquing as to matters of trial conduct and tactics adopted pursuant to defense counsel's professional opinion on the merits of the case. We find no travesty of justice here. If, as Mack seems to contend now, the attorney was throwing him to the

wolves in favor of his other clients, it is not without significance on the lack of prejudicial effect that all of the other defendants also were found guilty.

We have considered and find without merit other contentions raised by the appellants, which contentions for the most part are variational arguments of those which we have resolved hereinbefore. While perhaps the cessation of the war effort in Vietnam has brought that conflict and its divisiveness into a more objective focus, we still find appropriate to our present consideration and adopt the language with which Judge Sobeloff dealt with the underlying moral and philosophical problems of cases such as the present one in United States v. Moylan, 417 F.2d 1002, part III, at 1007–1009 (4th Cir. 1969), cert. denied, 397 U.S. 910, 90 S.Ct. 908, 25 L.Ed.2d 91 (1970). We agree that "the exercise of a moral judgment based upon individual standards does not carry with it legal justification or immunity from punishment for breach of the law." Id. at 1008.

Accordingly, the judgment of conviction on Count IV is reversed and the judgments of conviction on Counts I, II, and III are affirmed.